Filed 12/29/23; Certified for Publication 1/22/24 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC. et al., | D080902 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2021-00023385-CU-TT-CTL) |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents; | |
| CHINA SHIPPING (NORTH AMERICA) HOLDING CO., LTD. et al. | |
| Real Parties in Interest and Respondents. | |

APPEALS from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Reversed; remanded for further proceedings.

Bayron T. Gilchrist, Barbara B. Baird, Kathryn Roberts and Josephine Soyun Lee, for Plaintiff and Appellant South Coast Air Quality Management District.

Jacklyn H. Prange, Margaret T. Hsieh, David Pettit and Melissa Lin Perrella, for Plaintiffs and Appellants Natural Resources Defense Council San Pedro and Peninsula Homeowners Coalition, San Pedro Peninsula Homeowners United, Inc., East Yard Communities for Environmental Justice, and Coalition for Clean Air, Inc.

Office of the City Attorney of Los Angeles, Hydee Feldstein Soto, Steven Y. Otera, Justin M. Houterman and John T. Driscoll; Meyers Nave, Amrit S. Kulkarni, Julia L. Bond and Shaye Diveley, for Defendants and Respondents.

No appearances for Real Parties in Interest and Respondents China Shipping (North America) Holding Co., LTD et al.

I.

INTRODUCTION

On October 8, 2019, the Los Angeles Board of Harbor Commissioners (LABHC) certified a supplemental environmental impact report (the 2019 SEIR) regarding a project defined as "the continued operation of the China Shipping (CS) Container Terminal located in the Port of Los Angeles (Port), under new or revised mitigation measures" as complying with the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.). Appellants Community Petitioners[2] and South Coast Air Quality Management District (SCAQMD)[3] sued defendants the City of Los Angeles

_____

[1]  Further statutory references are to the Public Resources Code unless otherwise indicated.

[2]  Community Petitioners are San Pedro and Peninsula Homeowners Coalition, San Pedro Peninsula Homeowners United, East Yard Communities for Environmental Justice, Coalition for Clean Air, and Natural Resources Defense Council.

2

(the City), the Los Angeles City Council (City Council), the City of Los Angeles Harbor Department (LAHD) and LABHC, alleging a broad variety of CEQA violations with respect to the 2019 SEIR.[4]  The trial court determined that the 2019 SEIR violated CEQA in multiple ways, including in its failure to ensure that the mitigation measures included in the SEIR were enforceable.  The trial court also found that the SEIR failed to adequately analyze the emissions impacts of the project, and improperly modified or deleted mitigation measures that had been adopted in the original 2008 EIR regarding the use of alternative marine power and implementation of an electric yard tractor pilot project.  The trial court rejected the other CEQA claims.  Based on the CEQA violations the court did find, it issued a writ of mandate directing the Port to set aside the certification of the 2019 SEIR and to prepare a revised SEIR that complies with CEQA.  Although the Community Petitioners and SCAQMD requested additional briefing on the issue of whether the court could impose any further or additional remedy, including the cessation of Port activities or the required implementation of mitigation measures that had been included in the original EIR and retained in the SEIR, the trial court disallowed further briefing and indicated that it had provided the only remedy available under CEQA.

The Community Petitioners and SCAQMD appealed, arguing that the trial court erred in concluding that certain other mitigation measures

---

[3]    SCAQMD is a local agency with responsibility for comprehensive regulation of air pollution throughout the South Coast Air Basin, which includes all or portions of Los Angeles, Orange, Riverside, and San Bernardino Counties.  (Health & Saf. Code, §§ 40410, 40412.)

[4]    The Attorney General and California Air Resources Board (CARB) eventually intervened in the action, as well.

adopted in the 2019 SEIR constituted all feasible mitigation and erred in its determination that the only available remedy was to set aside the 2019 SEIR. We conclude that two of the other CEQA claims involving proposed mitigation asserted by appellants have merit, and we also agree with appellants that the trial court failed to comprehend the statutory authority granted to it under section 21168.9, the CEQA provision that authorizes court remedies for CEQA violations, and incorrectly believed that it was limited to ordering the Port to set aside its certification of the 2019 SEIR, only. We therefore reverse the judgment and remand to the court to allow it to consider its authority to fashion a remedy that it believes is appropriate considering the purposes of CEQA and the significance of the CEQA violations at issue in this case. We also direct the trial court to include further direction to the Port that any newly adopted SEIR address the failings that we have identified in the 2019 SEIR in this opinion, in addition to the failings that the trial court identified in its order.

## II.

## BACKGROUND

A.    *Contextual background*

The Port is the largest port in North America in terms of shipping container volume and cargo value. The Port and the adjacent Port of Long Beach together handle 64 percent of shipping on the west coast of the United States and approximately 35 percent of all shipping in the country. The Port's "major trading partners . . . include China/Hong Kong, Japan, South Korea, Taiwan, and Vietnam."

The Port is managed by the LAHD, an agency of the City.[5] The LAHD functions as a landlord by leasing out property at the Port to tenants, and it

---

[5]     We will refer to LAHD and the Port jointly as "the Port."

4

is the Port's tenants who are responsible for the daily handling of the cargo that comes through the Port. The Port houses 23 cargo terminals along its 43 miles of waterfront.

One of these cargo terminals is a 142-acre marine container terminal operating at Berths 97–109 (the Terminal) pursuant to a lease agreement entered into between the LAHD and China Shipping (North America) Holding Co., Ltd. (China Shipping).

B.    *The development of the Terminal*

In 2001, the LAHD issued Permit No. 999 (the Lease) to China Shipping, allowing it to construct and thereafter lease and operate the Terminal. The Lease provides for a term of 25 years, with three 5-year options to extend the Lease, exercisable by China Shipping.

Shortly after the Port and China Shipping entered into the Lease, multiple parties, including some of the parties who comprise the Community Petitioners in this matter, sued the Port for attempting to develop and operate the Terminal without having prepared a project-specific EIR for the planned three-phase development of the Terminal. (See *NRDC v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 270 (*NRDC I*).) On appeal in *NRDC I*, the appellate court agreed with the petitioners and directed the trial court (1) to order the Port to complete an EIR for all three phases of the project and (2) to issue an injunction staying the second and third phases of construction of the Terminal until further order of the court. (*Id.* at pp. 280–281, 285–286.) The first phase of construction, which the *NRDC I* court permitted to continue while the EIR was prepared, was completed in 2003.

In 2004, the petitioners in *NRDC I* and the Port entered into a court-approved settlement, pursuant to which the Port could complete construction of the Terminal and begin the first phase of operations at the Terminal while

5

it completed the EIR that had been court-ordered in exchange for incorporating multiple mitigation measures as part of the Terminal's construction and operation.[6]  Importantly, the stipulated judgment required the Port to amend the Lease so that China Shipping, which was not a party to the stipulated judgment, would also be bound by the mitigation measures agreed to by the Port.

In 2005, the Port and China Shipping amended the Lease to incorporate the mitigation measures included in the stipulated judgment.  As part of the amendment, the Port agreed to reimburse China Shipping for the costs associated with the settlement's AMP requirements, as well as the costs of purchasing lower emission cargo handling equipment.  The Port paid China Shipping $17.7 million in order to offset the increased operating costs associated with the mitigation measures, and agreed to pay an additional maximum of $3 million per year as reimbursement for the price difference between the increased cost of electricity associated with AMP over the cost of using "bunker fuel" while the ships are docked.

C.    *The certification of the EIR*

As required by *NRDC I, supra*, 103 Cal.App.4th 268, 285–286, and in conjunction with the terms of the stipulated judgment, in 2008 the Port certified an EIR for all three phases of the Terminal's construction, as well as

---

[6]    For example, among the mitigation measures the Port agreed to adopt was the use of "alternative maritime power" or "AMP," which allows ships to turn their engines off while docked, thereby reducing pollutant emissions by 71 to 93 percent.  In addition to incorporating infrastructure at the Terminal for providing AMP to docked ships, the Port agreed to pay up to $5 million to retrofit China Shipping's ships so that they could use AMP while docked at the Terminal, and further agreed to ensure that 70 percent of China Shipping's ships would use AMP while docked.

the Terminal's continued operation under a 40-year lease with China Shipping (the 2008 EIR).

In the 2008 EIR, the Port determined that the Terminal's operations would have significant environmental effects—particularly on air quality—and that it would disproportionately adversely impact minority and low-income populations. The EIR identified multiple feasible mitigation measures to be undertaken in order to reduce the negative effects of the Terminal's operations. Among the mitigation measures to be implemented under the 2008 EIR were (1) the increased use of AMP from 2005 through 2011, with 100 percent use of AMP by January 1, 2011; (2) increasing compliance with an expanded vessel speed reduction program (VSRP) that limited ship speed to no more than 12 knots within 40 nautical miles of the Port; (3) the transition to cleaner and zero-emission cargo-handling equipment; and (4) a requirement that an increasing percentage of drayage trucks calling at the Terminal use liquified natural gas (LNG).

The 2008 EIR stated that the Port would ensure the implementation of the identified feasible mitigation measures through incorporation of those measures into the Lease with China Shipping.

D.    *The post-2008 EIR period*

After certifying the 2008 EIR, the Port failed to modify the Lease with China Shipping to incorporate the environmental mitigation measures identified in it. According to the Port, "China Shipping took the position during . . . negotiations [to amend the Lease] that it was not required to agree to an amended lease because China Shipping was not a party to the ASJ [amended stipulated judgment] and did not participate in the 2008 EIS/EIR process."

7

The Los Angeles Times published an article in December 2015 outlining the Port's failure to adhere to the mitigation measures required in the 2008 EIR by permitting China Shipping to avoid consequences for violating various mitigation requirements, including the AMP requirements. The Los Angeles Times had obtained records through California Public Record Act requests that indicated that the Port had in fact expressly told China Shipping that it would not take action against it for failing to meet certain mitigation measures adopted in the 2008 EIR.[7]

Meanwhile, in September 2015, the Port made a public announcement that it intended to prepare a supplemental EIR to address issues with certain mitigation measures that had been adopted in the 2008 EIR. The Port stated: "The Supplemental EIR will evaluate potential impacts of the continued operation of the CS Container Terminal under new and/or modified mitigation measures (the proposed Project) . . . . Operation of the CS Container Terminal has been considered in previous environmental documents (LAHD 1997, USACE and LAHD 2008). China Shipping and LAHD are proposing re-evaluation of, and possible revisions to, certain mitigation measures that were analyzed in the FEIS/FEIR, based on the feasibility of some of the mitigation measures, the availability of alternative technologies, and other factors warranting re-analysis of mitigation measures." The Port admitted in this document that there were "11 mitigation measures . . . that have not yet been fully implemented for various reasons," and suggested that "feasibility, the availability of alternative

---

[7] For example, records obtained by the Los Angeles Times demonstrated that in 2009, the executive director of the Port indicated to China Shipping that it would not be held "responsible" for failing to meet the 70 percent AMP requirement included in the 2008 EIR.

technologies, and other factors" were reasons for the lack of implementation of some of the measures.

E.    *The 2019 SEIR*

For approximately four years, the Port engaged in the SEIR process. During this time, the Terminal continued to operate in the absence of full implementation of certain of the mitigation measures set out in the 2008 EIR.

In late September 2019, the Port issued the final SEIR for the Terminal (the 2019 SEIR). The project as defined by the final SEIR is the "continued operation of the Berths 97-109 China Shipping (CS) Container Terminal under new and/or modified mitigation measures." The Port refers to this project as the "Revised Project."

Similar to the 2008 EIR, the 2019 SEIR states that the new and/or revised mitigation measures identified in the environmental document "would be included in the new lease amendment." However, the 2019 SEIR, like the 2008 EIR before it, failed to provide a mechanism for making the mitigation measures legally enforceable.

Despite the lack of a clear mechanism for ensuring the implementation of the mitigation measures, the 2019 SEIR presumed that the mitigation measures would be implemented and it relied on those mitigation measures in setting out the environmental impacts of the Revised Project. The Port concluded that the continued operation of the Terminal would result in significant levels of pollution, even assuming that the mitigation measures would be implemented.[8]

---

[8]    For example, the Port estimated that in 2030, the peak year of emissions, the Terminal would release over 18 times the significance threshold of 10,000 metric tons of $CO_2E$.

On October 8, 2019, the LABHC certified the 2019 SEIR. No formal amendment to the Lease was referenced or included in LABHC's certification.

Community Petitioners, SCAQMD, and CARB each appealed the Board's certification of the 2019 SEIR to the City Council. The City Council denied the appeals and itself certified the 2019 SEIR on August 12, 2020.

F.    *The filing of this action*

On September 16, 2020, approximately a month after the City Council certified the 2019 SEIR, Community Petitioners and SCAQMD filed separate petitions for writs of mandate in Los Angeles County Superior Court challenging the 2019 SEIR.

Community Petitioners alleged, among other things, that the Port failed to make the mitigation measures in the 2019 SEIR legally enforceable, failed to require all feasible mitigation measures to minimize the significant environmental effects of the Revised Project, and improperly eliminated or modified certain mitigation measures that had been adopted in the 2008 EIR without demonstrating their infeasibility. SCAQMD alleged, among other things, that the Port failed to implement and enforce the mitigation measures that were in the 2008 EIR, used an improper baseline for analyzing the 2019 SEIR, adopted inadequate, uncertain and unenforceable mitigation measures, failed to adopt all feasible mitigation measures and rejected other proposed mitigation measures without making adequate findings, and failed to provide a good faith and reasoned analysis in response to significant issues raised by public comments. Both sets of petitioners sought a variety of relief, including a writ of mandate directing the setting aside of the Lease, the setting aside of the Port's decision to allow continued operation of the Terminal and its certification of the 2019 SEIR, the implementation and enforcement of the mitigation measures from the 2008 EIR, and the

10

refraining from granting further approvals for the operation of the Terminal until the Port fully complies with CEQA's requirements.

The trial court determined that the two matters were related and consolidated the cases. CARB and the Attorney General, acting on behalf of the People of California, successfully intervened in the action.

In April 2021, the trial court transferred the case to San Diego County Superior Court.

The trial court held a hearing on the merits of the petitions on June 24, 2022. Three days later, the trial court issued an order denying the petitions in part and granting them in part. Specifically, the court determined that the 2019 SEIR violated CEQA with respect to the mitigation measures relied on in the 2019 SEIR because *none* of the measures were made enforceable, as required by CEQA.[9] The court further determined that the 2019 SEIR's emissions impact analysis was not supported by substantial evidence because all of the calculations were based on an assumption that the Port and China Shipping would amend the Lease to incorporate the mitigation measures in 2019, yet there was no factual basis to support the conclusion that China Shipping would agree to amend the Lease. However, the court upheld as supported by the record the Port's decision in the 2019 SEIR to eliminate or modify some of the 2008 EIR mitigation measures because they are infeasible, and thus determined the Port's actions with respect to these mitigation measures complied with CEQA, but for the fact that the measures

---

9 The trial court stated that because of the lack of enforceability of the mitigation measures, "the Port has gone forward with the Revised Project—i.e., the continued operation of the Terminal—without implementing the mitigation measures to combat emissions," and also stated that "[t]he absence of such mitigation measures for project activity constitutes *a profound violation of CEQA*." (Italics added.)

11

were not made enforceable. However, as to two modifications of mitigation measures that had previously been adopted in the 2008 EIR (MM AQ-9, MM AQ-17), the court concluded that the Port's conclusions of infeasibility were not supported by substantial evidence in the record. The court thereafter proceeded to reject the petitioners' further arguments that the 2019 SEIR failed to adopt additional feasible mitigation measures with respect to greenhouse gases (GHG), top handlers and forklifts, and drayage trucks.

Although the petitioners and intervenors requested that the court consider additional briefing on the issue of what remedies would be appropriate in light of the trial court's rulings, the court rejected the request for additional briefing, stating: "The court may not direct the Port to carry out its obligations under CEQA in any particular way. Pub. Res. Code[,] § 21168.9(c). Absent a consent decree, the court may only declare an earlier CEQA document invalid and order it set aside. The court has done so here."

On July 15, 2022, the trial court entered a judgment in which it issued a peremptory writ of mandate, returnable in 60 days, directing the Port to:

> (1) "Set aside certification of the [2019 SEIR] for the revised Berths 97-109 [China Shipping] Container Terminal Project . . . by the Los Angeles Board of Harbor Commissioners on October 8, 2019 . . . as well as related project approvals";
>
> (2) "Provide a schedule for preparing a new supplemental or subsequent environmental review document for the Berths 97-109 [China Shipping] Container Terminal Project that complies with the California Environmental Quality Act ("CEQA") and revises the analysis in the SEIR where the Court—in its July 27, 2022 order—found Respondents failed to proceed as required by law or failed to support their findings with substantial evidence[ ] [and] [e]nsure that the new supplemental or subsequent environmental review document is prepared in good faith and without unreasonable delay";

12

(3) "Ensure that any future determinations, findings, and decisions to approve a project at Berths 97-109 [China Shipping] Container Terminal fully comply with CEQA, including by ensuring that any adopted mitigation measures are fully enforceable through permit conditions, agreements, or other legally binding instrument";

(4) "Take such further actions as may be necessary to comply with CEQA in accordance with the Court's June 27, 2022 order on Petitioners' and Intervenors' petitions in this action"; and

(5) "Within sixty (60) days after service of this writ of mandate, file and serve a return setting forth the actions taken to comply fully with the terms of this writ of mandate."

The trial court's judgment includes language by which the court "expressly retains jurisdiction over Respondents' return to the Writ and any subsequent return proceedings until the Court has determined that Respondents have fully complied with CEQA."

Community Petitioners and SCAQMD timely appealed from the judgment.

## III.

## DISCUSSION

Community Petitioners and SCAQMD both contend that the trial court erred in setting forth its remedy for the CEQA violations found to exist with respect to the 2019 SEIR. They contend that the trial court's chosen remedy—the setting aside of the 2019 SEIR while allowing operations at the Terminal to continue as those operations were occurring prior to the certification of the 2019 SEIR (i.e., without certain adopted mitigation measures being made enforceable and being implemented)—is insufficient to address the " 'profound' " CEQA violations the court found to exist.

13

Community Petitioners and SCAQMD argue both that the trial court failed to adequately understand the legal contours of the discretion granted to it by CEQA to fashion an appropriate remedy for the CEQA violations found, and that the court abused its discretion in failing to weigh the equities of allowing Terminal operations to continue without ensuring that some or all of the mitigation that was supposed to be implemented either pursuant to the 2008 EIR or the 2019 SEIR is being implemented while the Port revises its inadequate 2019 SEIR before allowing those operations to continue.

The Community Petitioners and SCAQMD also separately challenge the 2019 SEIR itself, arguing that the Port abused its discretion in certifying the 2019 SEIR because (1) the Port's rejection of a zero-emission demonstration project for cargo-moving equipment such as top handlers and large forklifts is not supported by substantial evidence; (2) the Port's decision to make a GHG emissions fund measure a lease measure rather than a mitigation measure is not supported by substantial evidence; and (3) the Port failed to respond adequately to comments and requests that it appoint an independent third party to monitor the Revised Project's compliance with the adopted mitigation measures.

In addition, SCAQMD separately argues that the Port abused its discretion in certifying the 2019 SEIR because (1) the Port's decision to delete as infeasible the drayage truck fleet mitigation measure in the 2008 EIR requiring an increasing percentage of trucks that utilize LNG is not supported by substantial evidence; (2) the Port's decision not to implement another replacement mitigation measure requiring some other near-zero or zero-emission drayage truck technology to replace the LNG drayage truck mitigation measure is not supported by substantial evidence; and (3) the Port's decision to modify a 2008 EIR mitigation measure by reducing the

14

required compliance with a vessel speed reduction program from 100 percent to 95 percent is not supported by substantial evidence.

As we explain further, we agree with some of Community Petitioners and SCAQMD's arguments on appeal that certain of the Port's actions regarding the modification or rejection of certain mitigation measures in the 2019 SEIR are not supported by substantial evidence. However, as to other mitigation measure decisions, we conclude that substantial evidence supports the Port's determinations. Finally, we agree with Community Petitioners and SCAQMD that the trial court's comments indicate that the court failed to appreciate the full scope of its authority to determine what would be an appropriate remedy for the CEQA violations found to exist in this case.

A. *Relevant legal standards*

1. *CEQA overview and the role of an EIR*

"CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*Building Industry*).) "CEQA embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.' [Citations.] [¶] CEQA prescribes how governmental decisions will be made when public entities, including the state itself, are charged with approving, funding—or themselves undertaking—a project with significant effects on the

15

environment." (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711–712, italics omitted (*Eel River*).) "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]" (*Laurel Heights, supra,* 47 Cal.3d at pp. 390–391; see Cal. Code Regs., tit. 14, § 15002, subd. (f).)[10] A "significant effect" is defined as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) "The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.] 'Because the EIR must be certified or rejected by public officials,

_____

[10] The state regulatory guidelines that implement CEQA (the Guidelines) are set forth in the California Code of Regulations, title 14, section 15000, et seq. (See § 21083.) "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' [Citation.] In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2 (*Muzzy Ranch*).)

16

it is a document of accountability.  If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to [an] action with which it disagrees.' [Citation.]  The EIR "protects not only the environment but also informed self-government.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512 (*Sierra Club*).)  In this way, " ' "[t]he EIR is the heart of CEQA," and the integrity of the process is dependent on the adequacy of the EIR.' " (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924.)

"Ideally, an EIR serves 'to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided.' " (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627 (*County of Butte*), quoting Pub. Resources Code, § 21002.1, subd. (a).)  An EIR "must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects. [Citation]"  An EIR may also include a discussion of the economic and social effects of the project.[Citation]" (*County of Butte*, at p. 627.)

Because the EIR "serves to inform decision makers and the general public about the nature and environmental impact of a proposed project, feasible ways to reduce that impact (often through the mechanism of

17

mitigation measures), and possible alternatives to the project [citation]" (*County of Butte, supra*, 13 Cal.5th at p. 627), it is fundamental that an EIR "include a *meaningful* discussion of . . . mitigation measures" (*Laurel Heights, supra*, 47 Cal.3d at p. 403, italics added). "Mitigation measures are modifications of the proposed design and implementation of a project imposed by the lead agency to reduce the project's adverse environmental effects. If an EIR identifies significant environmental effects, CEQA requires the adoption of mitigation measures when 'it is feasible to do so.' " (*County of Butte, supra*, 13 Cal.5th at p. 627.)[11] As the Supreme Court has noted, "CEQA's mitigation measures play a crucial role in reducing the environmental impact of projects undertaken in California." (*Id.* at p. 628.)

However, "CEQA recognizes that 'economic, social, [technological] or other conditions [may] make it infeasible to mitigate one or more significant effects on the environment' and that in those circumstances 'the project may

---

[11]    The Guidelines specify that " 'mitigation' includes" the following:

> "(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

> "(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

> "(c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment.

> "(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

> "(e) Compensating for the impact by replacing or providing substitute resources or environments, including through permanent protection of such resources in the form of conservation easements." (Guidelines, § 15370.)

18

nonetheless be carried out or approved at the discretion of a public agency if the project is otherwise permissible under applicable laws and regulations.' " (*County of Butte, supra*, 13 Cal.5th at p. 627, quoting Pub. Resources Code, § 21002.1, subd. (c).) CEQA defines " '[f]easible' " as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.)

Because of the critical importance of mitigation measures in reducing environmental impacts, an agency generally may not defer formulation of mitigation measures to the future. (Guidelines, § 15126.4, subd. (a)(1)(B).) However, an agency may develop the specific details of a mitigation measure "after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will considered, analyzed, and potentially incorporated in the mitigation measure." (*Ibid*.)

In addition, "[a] public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures. Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, in the case of the adoption of a plan, policy, regulation, or other public project, by incorporating the mitigation measures into the plan, policy, regulation, or project design." (§ 21081.6, subd. (b); see Guidelines, § 15126.4, subd. (a)(2) ["Mitigation measures must be fully enforceable through permit conditions, agreements, or other legally-binding

19

instruments," or may be "incorporated into the plan, policy, regulation, or project design."].)

"Further, to 'ensure that the mitigation measures and project revisions identified in the EIR . . . are implemented,' the lead agency, when approving the EIR, must also adopt 'a program for monitoring or reporting on the revisions which it has required in the project and the measures it has imposed to mitigate or avoid significant environmental effects.' " (*County of Butte*, *supra,* 13 Cal.5th at p. 628, quoting Guidelines, § 15097, subd. (a).)

B.     *Analysis*

1.     *Appellants' challenges to Port's actions with respect to mitigation measures in the 2019 SEIR*

The Community Petitioners and SCAQMD contend that certain determinations made by the Port in the 2019 SEIR violate CEQA.[12]

a.     *Standards of review applicable to challenges to an agency's compliance with CEQA*

When an appellant challenges whether an agency's actions complied with CEQA, an "appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review [of an Agency's action] under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427; see *Muzzy Ranch*, *supra*, 41 Cal.4th at p. 381 ["In a CEQA case, as in other mandamus cases, our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision."].)

_____

[12]     Again, the trial court agreed with the petitioners that some of the Port's determinations in the 2019 SEIR violated CEQA, but the court rejected other of the petitioners' challenges to the 2019 SEIR.  On appeal, the Community Petitioners and SCAQMD limit their challenges to a subset of the petitioners' challenges to the 2019 SEIR that the trial court rejected.

20

"The standard of review [applied to the agency's action] in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion. Section 21168.5 states in part: 'In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.]  Our decisions have thus articulated a procedural issues/factual issues dichotomy.  '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.  (§ 21168.5.)  Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.  In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' "  (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

The *Sierra Club* court explained that the "procedural issues/factual issues dichotomy" has generally worked well for courts reviewing agency determinations.  (*Sierra Club, supra*, 6 Cal.5th at p. 512.)  For example, some procedural questions, such as whether an agency has provided sufficient notice and opportunity to comment on a draft EIR, or whether an agency has entirely omitted a required discussion, have clear answers.  However, in other scenarios, "the question whether an agency has followed proper procedures is not always so clear.  This is especially so when the issue is

21

whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decision making and informed public participation.' " (*Id*. at pp. 512–513.)

The Supreme Court thus summarized three "basic principles" regarding the standard of review applicable to questions raised as to the adequacy of an EIR:  "(1) An agency has considerable discretion to decide the manner of the discussion of potentially significant effects in an EIR. (2) However, a reviewing court must determine whether the discussion of a potentially significant effect is sufficient or insufficient, i.e., whether the EIR comports with its intended function of including ' " 'detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' [Citation.] (3) The determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions." (*Sierra Club, supra*, 6 Cal.5th at pp. 515–516.)  "The *ultimate inquiry*, as case law and the CEQA guidelines make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Id*. at p. 516.)  Generally, that inquiry is a mixed question of law and fact subject to de novo review, but to the extent factual questions (such as the agency's decision with respect to which methodologies to employ for analyzing an environmental effect) predominate, a substantial evidence standard of review will apply.  (*Ibid*.)  In considering such questions, however, courts "do not require technical perfection or scientific certainty: ' " '[T]he courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at

22

full disclosure.' " ' " (*Id.* at p. 515.) In sum, "the reviewing court must decide whether the EIR serves its purpose as an informational document" (*id.* at p. 516), by providing sufficient detail to enable " 'the public to discern from the [EIR] the "analytic route the . . . agency traveled from evidence to action" ' " (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262 (*California Oak Foundation*)).

Substantial evidence for CEQA purposes is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (*Id.*, subd. (b).) It does not include argument, speculation, unsubstantiated opinion or narrative, or clearly erroneous or inaccurate evidence. (*Id.*, subd. (a).)

>    b.   *Application*
>
>    i.   *The Port's rejection of a zero-emission demonstration project for cargo-moving equipment such as top handlers and large forklifts*

Appellants contend that the Port should not have rejected a suggestion that it adopt as a mitigation measure a zero-emission top handler and large forklift demonstration project and the subsequent deployment of the use of any zero-emission equipment demonstrated to be successful through such a pilot project. Community Petitioners argue that the 2019 SEIR "does not even consider whether it would be feasible to require zero-emission top handlers and large forklifts after a successful demonstration project," and instead "merely repeats its conclusion that zero-emission top handlers and

23

large forklifts are not currently feasible without addressing whether the Port should require a demonstration project."

As stated earlier, CEQA requires the adoption of mitigation measures to reduce significant environmental effects whenever " 'it is feasible to do so.' " (*County of Butte*, *supra*, 13 Cal.5th at p. 627.) CEQA defines " '[f]easible' " as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.) In other words, a mitigation measure must be adopted only where the measure can actually accomplish the reduction or elimination of certain of the project's adverse environmental effects "within a reasonable period of time." (§ 21061.1; Guidelines, § 15364.)

Here, the Port's technology review found that "zero- and near-zero-emissions top handlers are not yet in commercial production and that the technologies did not achieve the basic considerations of commercial and technical viability needed for further consideration," and that "[g]iven their lack of demonstrated ability to perform as required in marine terminals, . . . zero- and near-zero-emissions top handlers are not yet feasible technologies." This conclusion is supported by substantial evidence in the record, which includes a 2018 Feasibility Assessment for Cargo-Handling Equipment report, prepared by consultants Tetra Tech and Gladstein, Neadross & Associates in connection with the 2017 Clean Air Action Plan Update (2017 CAAP), created by the Ports of Long Beach and Los Angeles.[13] The authors of this report determined that, with the exception of electric

---

[13] The 2017 CAAP "serve[s] as high-level guidance for continued emission reduction activities in collaboration with industry stakeholders, regulatory agencies, local communities, and environmental groups for the next 20 years."

24

rubber-tired gantry cranes and yard tractors, other zero- and near-zero-emission cargo handling equipment was not commercially and/or technically viable. Thus, the Port concluded that zero- or near zero-emissions technologies in other cargo handling equipment, while "promising," nevertheless "require longer-term evaluations to establish the technical viability, operational reliability and the ability to attract participation from established original equipment manufacturers . . . ." Given the current state of zero- or near-zero-emission technologies described in the 2018 Feasibility Assessment for Cargo-Handling Equipment report, the record supports the Port's determination that such technologies are not currently technologically and operationally viable as replacements for current Terminal cargo handling equipment. It appears clear, and appellants do not dispute, that the Port did not abuse its discretion in concluding that it could not rely on the use of zero- or near-zero-emission cargo handling equipment to accomplish the mitigation of cargo handling emissions "within a reasonable period of time" (§ 21061.1), and thus did not adopt a mitigation measure requiring the present use of such equipment.

Appellants nevertheless argue, however, that the Port should have adopted as a mitigation measure a *demonstration program* for zero- or near-zero-emission cargo handling equipment. We are not convinced. Mitigation measures are, by their nature, modifications incorporated into a project that will—in actuality—reduce a project's adverse environmental effects. (See, e.g., *County of Butte, supra,* 13 Cal.5th at p. 627 ["Mitigation measures are modifications of the proposed design and implementation of a project imposed by the lead agency to reduce the project's adverse environmental effects."].) A demonstration program, by *its* nature, is test project, aiming to determine whether a particular program can achieve a successful outcome; as a result, a

25

demonstration program may not be successful in reducing or minimizing an adverse environmental impact. Because mitigation under CEQA requires the actual reduction of a significant environmental effect, a project requirement for a demonstration project would not meet this standard.[14] Appellants have therefore not demonstrated that the Port abused its discretion in declining to adopt a zero- or near-zero-emission cargo handling equipment demonstration project as a mitigation measure in the 2019 SEIR.

> ii. *The Port's decision to make a greenhouse gas (GHG) emissions fund measure a lease measure rather than a mitigation measure is not supported by substantial evidence*

Appellants assert that the Port abused its discretion with respect to the adoption of a nonbinding measure requiring China Shipping to make annual contributions of $250,000 over an eight-year period (for a total of $2 million) to a "Greenhouse Gas Fund." According to the 2019 SEIR, the GHG Fund will be used to pay for Port-approved emissions reduction projects or to purchase credits from a CARB-approved offset registry.[15] NRDC sets forth a multi-pronged challenge to the "Greenhouse Gas Fund" measure. For example, NRDC challenges the sufficiency of the evidence to support the Port's reasoning for concluding that the "Greenhouse Gas Fund" measure could not be adopted as a *mitigation* measure but instead should only be

---

14 Appellants have not cited to any case that considers or examines a mitigation measure consisting of the requirement of a demonstration project, and this court has not independently found one. Nor do the Guidelines discuss the use of demonstration or pilot programs as possible mitigation.

15 A GHG emission "offset" is an "activi[y] that reduce[s] or eliminate[s] [GHG] emissions or increase carbon sequestration." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 485 (*Golden Door*).)

26

adopted as a lease measure. Specifically, NRDC challenges whether the assertion made by the Port that the efficacy of the use of funds to reduce emissions "cannot be quantified"—and therefore its decision not to make the measure a binding mitigation measure—are supported by substantial evidence. NRDC also contends that this measure was effectively included in the 2019 SEIR as a mitigation measure, as opposed to a mere lease measure, because the Port relied on the measure for a reduction in emissions. Finally, NRDC argues that the measure is deficient as a mitigation measure in two respects: (1) the amount required of China Shipping to pay into the fund is insufficient; and (2) the measure fails to contain restrictions on where the offsets may be purchased, and in this way the measure fails to ensure that the offsets are real, "enforceable," and "not otherwise required" (see Guidelines, § 15126.4, subds. (a)(2), (c)(3)).

The 2019 SEIR acknowledges that the GHG impacts of the Revised Project are significant, in that the GHG emissions will exceed the significance threshold of 10,000 metric tons of $CO_2E$ in "all study years."[16] In recognition of the significant GHG impacts of operating the Terminal pursuant to the Lease, the 2019 SEIR includes two new measures, beyond the mitigation measures that were included in the 2008 EIR and re-adopted or modified in the 2019 SEIR. First, the 2019 SEIR adopted new mitigation measure MM GHG-1, which requires that "[a]ll lighting withing the interior of buildings on the premises and outdoor high mast terminal lighting . . . be replaced with LED lighting or a technology with similar energy-saving capabilities within two years after the effective date of the new lease amendment between the

_____

[16] The Port has estimated that Terminal operations will release between 65,534 and 183,424 metric tons of $CO_2E$ per year, with the peak release occurring in 2030, even after the adopted mitigation measures are implemented.

27

Tenant and the LAHD or by no later than 2023." Second, the 2019 SEIR adopted new lease measure LM GHG-1, which requires the establishment of the GHG Fund, which "shall be used for GHG-reducing projects and programs approved by the Port of Los Angeles, or through the purchase of emission reduction credits from a CARB approved offset registry." The lease measure requires China Shipping to make annual contributions of $250,000 to a newly established Greenhouse Gas Fund for a period of eight years, for a total contribution of $2 million. The Port reached the $2 million figure by multiplying the excess GHG emissions over the significance threshold of 10,000 metric tons/year expected to be released in 2030 (i.e., 129,336 metric tons of $CO_2E$) by the 2019 market value of carbon credits set by CARB (i.e., $15.62). In other words, the 2019 SEIR asks China Shipping to pay for carbon offsets for the excess GHG emissions the Terminal will release in 2030—a single year of the Lease.

NRDC challenges LM GHG-1 on the ground that the Port relies on the lease measure as a GHG emissions reduction measure in the 2019 SEIR but fails to ensure that the amount accounts for the many years of excess GHG emissions that will result from activities at the Terminal over the life of the Lease, and because it lacks restrictions as to where the offsets derive, thereby failing to ensure that the offsets funded "are real, 'enforceable,' and 'not otherwise required,' " as necessary under the Guidelines (see Guidelines, § 15126.4, subds. (a)(2), (c)(3)).

The Port takes the position that because the GHG Fund measure is a "lease measure" only, and was specifically disclaimed as a "mitigation measure," the Port is not relying on the measure to reduce the Revised Project's significant impacts and none of the legal requirements that apply to mitigation measures apply to the Greenhouse Gas Fund measure. According

28

to the Port, the 2019 SEIR "attributed no credit for reduction in GHG emissions to LM GHG-1." The Port contends that its conclusion that the actual mitigation included in the 2019 SEIR constituted "all feasible mitigation for GHG emissions" is a determination that is supported by substantial evidence in the record, "namely the Port's comprehensive evaluation of currently available GHG emissions-control technologies." Because the Port is not relying on the "Greenhouse Gas Fund" measure as mitigation, the Port's argument goes, NRDC's legal citations are inapplicable because they involve "case law concerning whether certain measures in other EIRs constituted valid 'mitigation' under CEQA that could be credited with avoiding or reducing significant environmental impacts." According to the Port, the 2019 SEIR "specifically declaimed LM GHG-1 as a CEQA mitigation measure," and instead identified it "as a lease condition" because it could "potentially contribut[e] to ongoing efforts to bring Port-wide GHG emissions down," but it "could not be determined to reduce or avoid" the emissions impacts of operations at the Terminal.

As NRDC points out, however, the Port does appear to rely on the reduction in GHG emissions from LM GHG-1, the GHG Fund, in its decision-making surrounding the 2019 SEIR. For example, in the Port's Findings of Fact and Statement of Overriding Considerations in the 2019 SEIR, the Port states that it has found "that changes or alterations have been required in, or incorporated into, the Revised Project, *in the form of* MM GHG-1 and *LM GHG-1*, below, *that lessen the significant environmental effect identified in the Final SEIR*." (Italics added.) In addition, throughout the SEIR process, the Port repeatedly refers to LM GHG-1 as a "mitigation measure," despite titling it a mere "lease measure." For example, the circulated Draft SEIR (the RDSEIR) refers to LM GHG-1 as one of two "[n]ew GHG *mitigation*

29

measures, summarized below, [that] would reduce GHG emissions." (Italics added.) In addition, in responding to comments from NRDC in which it charged the Port with failing to grapple fully with the issue of the Revised Project's GHG impacts, the Port refers to the GHG Fund measure as one of "two additional mitigation measures" that were "introduce[d]" in connection with the Revised Project "to reduce its GHG impacts." In another response to a comment proposing that "mitigation funds should be provided to the Harbor Community Benefit Foundation for projects to reduce GHG impacts off-port property," the Port responded that the commenter "provides no evidence or data that providing offset credits to the California Air Resources Board [(CARB)] or another appropriate entity for GHG-reducing projects and programs *on Port of Los Angeles property would be insufficient to mitigate the GHG impacts of the Revised Project.*" (Italics added.) Such language is imbued with the implication that the Port believes that the GHG Fund was created, in part, as a means of mitigating at least some of the GHG impacts of the Terminal's operation. All of this language appears to conflict with the Port's assertion that it was not relying on LM GHG-1 as mitigation for the GHG emission impacts of the Revised Project.

Further, and more importantly, the 2019 SEIR fails to adequately inform the public and decisionmakers about the reasoning underlying the Port's decision to make LM GHG-1' a mere lease measure and not a mitigation measure. An EIR is, fundamentally, an informational document, and as such, it must "reasonably set[ ] forth sufficient information to foster informed public participation and to enable the decision makers to consider the environmental factors necessary to make a reasoned decision." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Commissioners* (2001) 91 Cal.App.4th 1344, 1356.) The 2019 SEIR fails with respect to this purpose in

connection with LM GHG-1. Although the Port asserts that it could not rely on LM GHG-1 for mitigation (despite having elsewhere referred to it in ways suggesting it is to have a mitigating role), the basis for the Port's contention that LM GHG-1 cannot be a mitigation measure is its assertion that the "effectiveness of LM GHG-1 cannot be quantified." This statement constitutes the entirety of the Port's explanation as to why the GHG Fund measure was included as a "lease measure" and not a "mitigation measure." The assertion that the effectiveness of directing money toward projects intended to offset GHG emissions "cannot be quantified" does not include any *explanation*, let alone evidence (such as expert opinion or analysis), as to why the effectiveness of a fund utilized, for example, for the purchase of carbon offsets that do ultimately satisfy CEQA's mitigation requirements cannot be quantified.[17] The Port merely asserts it is so. Such an assertion, without a reasoned explanation, is insufficient under CEQA. Again, "[t]he basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.] 'Because the EIR must be certified or rejected by public officials, it is a document of accountability." (*Sierra Club*, *supra*, 6 Cal.5th at p. 511.)

In order to ensure that an EIR is a "document of accountability" (*ibid*.), an EIR must engage in a meaningful way with the issues raised and provide detail sufficient to allow others to understand the analysis relied on by the

---

17     In *Golden Door*, *supra*, 50 Cal.App.5th at pp. 483, 562, the court rejected an adopted carbon offset purchase mitigation measure as violating CEQA in a variety of ways, but in doing so the court also indicated that it is possible for carbon offsets to meet CEQA standards and be used to mitigate GHG emissions.

31

agency: "To fulfill the EIR's informational role, the discussion of the mitigation measures must contain facts and analysis, not bare conclusions and opinions. [Citation.] The level of detail CEQA requires in the EIR's discussion of facts and analysis of the mitigation measures depends on 'whether the EIR includes enough detail "to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 869 (*King*).)

The Port must " 'enable those who did not participate [in the preparation of the 2019 SEIR] to understand and consider meaningfully' " (*King, supra,* 45 Cal.App.5th at p. 869) the basis for the Port's determination that it cannot quantify the effectiveness of the establishment of a fund for the purpose of paying for GHG-reducing projects approved by the Port of Los Angeles or for the purchasing of emission reduction credits. It is possible that the Port's assertion is true and there is no reasonable way to quantify the potential effectiveness of the use of the GHG Fund for GHG-mitigating programs or the purchase of carbon emission reduction credits. But those relying on this document for making decisions regarding the Terminal have no way of assessing the truth of the Port's assertion without more.

Further, it is difficult to understand why the Port contends that it cannot quantify the effectiveness of an appropriately drawn measure regarding the use of fees to pay for carbon offsets. It appears clear that agencies may utilize carbon offsets to mitigate GHG emission impacts under CEQA, as long as the use of carbon offsets meets the standards for validity necessary to meet CEQA's mitigation standards as those requirements are described in *Golden Door, supra,* 50 Cal.App.5th at page 562. "Generally speaking, CEQA permits mitigation measures for GHG emissions to include

32

offsite measures, including purchasing offsets," where such measures incorporate procedures to ensure that the GHG reductions are quantified accurately. (*Ibid.*; see *id*. at p. 483 ["Our decision is not intended to be, and should not be[,] construed as blanket prohibition on using carbon offsets— even those originating outside of California—to mitigate GHG emissions under CEQA."].)[18] Certainly, there is nothing in CEQA that seems to prevent the use of fees intended to pay for off-project-site mitigation as a possible method of mitigating of environmental effects. The Guidelines indicate that mitigation may include "[c]ompensating for the [significant environmental] impact by replacing or providing substitute resources or environments . . . ." (Guidelines, § 15370, subd. (e).) The Guidelines also permit off-site mitigation of GHG emissions so long as the measures are

---

[18] As discussed in *Golden Door*, the use of certain procedures—or protocols—is what ensures that offsets represent true reductions in GHG emissions. "The State Air Resources Board (CARB) is 'the state agency charged with monitoring and regulating sources of emissions of greenhouse gases that cause global warming in order to reduce emissions of greenhouse gases.' (Health & Saf. Code, § 38510.) CARB has pursued several strategies for reducing GHG emissions, including a cap-and-trade program. (Cal. Code Regs., tit. 17, §§ 95801–96022; *Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487, 1498, fn. 6.)" (*Golden Door, supra*, 50 Cal.App.5th at p. 484, fn. omitted.) "Under cap-and-trade, an offset project must use a CARB-approved [protocol] (CARB Protocol). [Citation.]" (*Id*. at p. 508.) " 'Protocols are the formalized procedures for accounting for credits that ensure the credits are an accurate and reliable representation of emission reductions that actually occurred.' [Citation.] Protocols ' "qualify and quantify GHG destruction, ongoing GHG reductions or GHG removal enhancements achieved by an offset project. " ' [Citation.]" (*Id*. at pp. 507– 508.) Thus, "CARB Protocols are designed to 'ensure that the reductions are quantified accurately, represent real GHG emissions reduction, and are not double-counted within the system.' " (*Id*. at p. 508.)

33

supported by "substantial evidence and subject to monitoring or reporting." (Guidelines, § 15126.4, subd. (c).) In addition, the assessment of a fee may constitute an appropriate form of mitigation, as long as it is linked to a specific mitigation plan or program designed to address a cumulative impact. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 139–140.)

The ability to quantify the use of a fee-based measure for GHG emission reduction, even if offsite, appears to be supported by the fact that the Port utilized a method for calculating the amount that China Shipping would be required to pay that itself appears to quantify the carbon offsets that could be purchased through the fund. In other words, some "quantification" of mitigation appears to be involved in the Port's determination of the amount it would require China Shipping to pay into the GHG Fund in the 2019 SEIR. The document explains:

> "The [LM GHG-1] fund contribution amount is established as follows: (i) the peak year of GHG operational emissions (2030), after application of mitigation, that exceed the established threshold for the Revised Project, estimated in the SEIR to be 129,336 metric tons $CO_2E$, multiplied by (ii) the current (2019) market value of carbon credits established by CARB at $15.62 per metric ton $CO_2E$. The payment for the first year shall be due within ninety (90) days of the Conclusive Determination of Validity Date, and the payment for each successive year shall be due on the anniversary of the Conclusive Determination of Validity Date. If LAHD is unable to establish the fund through an MOU with CARB within one year prior to when any year's payment is due, the Tenant shall instead apply that year's payment, using the same methodology described in parts (i) and (ii) above, to purchase emission reduction credits from a CARB approved GHG offset registry."

As this describes, the Port decided that it would have China Shipping pay an amount that represents compensation for the excess GHG emissions over the significance threshold expected to be released into the environment as a result of the Terminal's operations in the year 2030, with the result being that China Shipping is to pay into the fund the value of an amount equivalent to 128,041 metric tons of carbon emission reductions. This calculation, in and of itself, appears to quantify the emission reductions that could be obtained through the purchase of carbon offset credits that comply with CARB Protocols. As NRDC notes, by requiring China Shipping to pay $2 million into the GHG Fund, the 2019 SEIR effectively concedes that it is economically feasible for China Shipping to pay *at least* $2 million to address GHG emissions. If, as the 2019 SEIR indicates, the fund is to be used for projects that will "lessen the significant environmental effect" caused by GHG emissions at the Terminal and the Port has seemingly quantified an amount of GHG emissions that can be mitigated through purchasing offsets, it is unclear why the Port did not adopt the measure as an *enforceable* mitigation measure and Port has failed to adequately explain its decision.

In sum, the 2019 SEIR does not provide sufficient detail to enable " 'the public to discern from [it] the "analytic route the . . . [Port] traveled from evidence to action" ' " (*California Oak Foundation*, *supra*, 188 Cal.App.4th at p. 262) with respect to LM GHG-1, and as a result, the Port abused its discretion under CEQA in this regard.

### iii. *Independent monitor for mitigation measure compliance*

Appellants contend that the Port "improperly ignored requests to appoint an independent third party to monitor compliance with mitigation measures." (Boldface omitted.) According to appellants, the Port "did not

35

respond adequately to Community Petitioners' request" that it appoint an independent party to oversee a more robust monitoring and reporting program, but instead "tersely stated that the " 'comment is noted' " and that the " 'elements requested' " were not required under CEQA. Appellants assert that the Port's "summary dismissal of the request for a third-party monitor in light of the Port's history of noncompliance is not the 'good faith, reasoned analysis' that CEQA requires," given that the Port "failed to set forth, in any detail, why Community Petitioners' requests were rejected."

As with at least one other contention raised by appellants, the parties disagree as to the standard of review applicable to this particular appellate claim. Given that this issue does not involve the adoption or rejection of a mitigation measure, but, rather, is framed as a challenge to the Port's response to comments made to a draft version of the environmental document, a brief discussion of the question of the appropriate standard is warranted. The Port asserts that any review of its response to comments to the draft in which parties suggested that the Port appoint an independent monitor to ensure compliance with the mitigation measures should be one to determine whether substantial evidence supports the Port's response. Appellants, on the other hand, contend that the purported inadequacy of the Port's response to this issue constitutes "a failure to 'proceed[] in a manner required by law,' " and they contend that their claim should be reviewed for its legal sufficiency—i.e., de novo. We believe that *Sierra Club, supra*, 6 Cal.5th at page 516, provides guidance as to this question: "The ultimate inquiry [for purposes of challenges to the adequacy of an EIR's discussion], as case law and the CEQA Guidelines make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed

36

project,'" and typically, this inquiry is a mixed question of law and fact subject to de novo review, unless factual questions predominate with respect to the issue raised and then the question is reviewed for substantial evidence. (*Ibid*.)  Therefore, to the extent that appellants are challenging whether the response to a comment includes enough detail to allow one to understand and consider the issues, we review the claim de novo.

The comment submitted by Community Petitioners that included a request for the appointment of an independent compliance monitor was as follows:

> "The management failures that led to the current China Shipping situation must never recur.  Yet, the SDEIR appears to incorporate the same program that proved ineffective in monitoring and enforcing the 2008 mitigation measures.[ ]  To ensure that mitigations are actually implemented and monitored for compliance, we recommend the following:
>
> "1. A full public accounting of why the lease with China Shipping was never amended to include the 2008 measures, and why waivers were granted from AMP.  A full understanding of what led to the current predicament is essential to ensuring any future mitigation and monitoring program does not repeat past mistakes.
>
> "2. Ongoing public disclosure of the status of all mitigation measures for all past and present Port CEQA projects. *A third party—agreeable to the Port and the community— should be selected to oversee this monitoring reporting process*.  The reporting plan should include, at a minimum:
>
> "• An assessment of mitigation compliance based on on-site visits, interviews, data from the drayage truck registry, and review of equipment and vehicle inventories.
>
> "• Throughput tracking to determine if actual throughput exceeds the projections in previously certified EIRs. In

years when throughput exceeds projections, an assessment of excess emissions attributable to that throughput should be performed, as well as a plan to deal with those excess emissions.

"• Ongoing assessment and implementation of cleaner technologies and practices that can be implemented at the terminals.

"3. Creation of a permanent and independent oversight committee, funded to conduct audits of the implementation of all committed mitigation measures, port-wide. The committee could be modeled after the disbanded Port Community Advisory Committee (PCAC). The committee's work should be coordinated with the work of the third-party monitor." (Italics added, footnote omitted.)

In response to this particular comment, the 2019 SEIR stated, in relevant part:

"This is not a comment on the adequacy of the Recirculated DSEIR. As described in more detail in Response to Comment CSPNC-1, none of the elements requested—a discussion of the past, disclosure of the mitigation status of other projects, or formation of a committee to oversee port-wide compliance—is either within the scope of this SEIR or required by CEQA. Please note, however, that sections 1.2.3 and 1.2.4 of the Recirculated DSEIR already describe in adequate detail the background of the Revised Project, including the status of the lease with China Shipping and the reasons why some mitigation measures were not complied with.

"Per CEQA, LAHD will adopt a mitigation monitoring and reporting program designed to ensure compliance with mitigation measures during the implementation of the Revised Project. CEQA does not mandate specific requirements for the program, but rather provides substantial flexibility to lead agencies, such as LAHD, to adopt monitoring and reporting programs and tailor them to specific projects. There is no requirement under CEQA

38

that LAHD must provide a full public accounting of past activities at the Project site, disclosure the mitigation and monitoring status of other projects or form a committee to oversee Port-wide compliance. Nonetheless, for non-CEQA purposes, the comment is noted and is hereby part of the Final SEIR, and is therefore before the decision-makers for their consideration prior to taking any action on the Revised Project."

The requirement that an agency respond to "comments" to a draft EIR derives not from a particular statutory provision of CEQA, but, rather, from section 15088 of the Guidelines. (*City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 548 (*City of Irvine*).) Subdivision (a) of Guidelines section 15088 itself merely requires that the agency "evaluate comments on environmental issues received from persons who reviewed the draft EIR and . . . prepare a written response" when the comments are received during the noticed comment period. However, there is a more specific mandate in subdivision (c) that requires an agency to respond in good faith and with reasoned analysis only to "*significant* environmental issues" raised in comments whenever the agency's position is "at variance" with the comment about the "significant" environmental issue. (Guidelines, § 15088, subd. (c), italics added.)[19] Thus, "[w]hen a comment raises a 'significant'

---

[19] The full text of section 15088, subdivision (c) of the Guidelines is as follows:

"The written response shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular, the major environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted. There must

39

environmental issue, there must be some genuine confrontation with the issue; it can't be swept under the rug [citation]. Responses that leave big gaps in the analysis of environmental impacts (such as missing entirely the existence of adjacent wetlands) are obviously inadequate [citation].  By the same token, comments that bring some new issue to the table need genuine confrontation [citation].  And comments that are only objections to the merits of the project itself may be addressed with cursory responses [citation]." (*City of Irvine*, at p. 553.)

In this case, the Port's response conveyed the legal basis for its rejection of the suggestion of the appointment of an independent monitor. CEQA requires that an agency adopt a program for either "reporting or monitoring" mitigation compliance.  (§ 21081.6; Guidelines, §15097, subd. (a).)  An agency has discretion in choosing a compliance program, however.  (Guidelines, § 15097, subd. (c) [providing that agency "may choose whether its program will monitor mitigation, report on mitigation, or both"].) Further, while an agency also has discretion as to whether to delegate its "reporting or monitoring responsibilities to another public agency or to a private entity," there is no requirement that it do so, and the Guidelines ensure that even if such a delegation is made, the agency "remains responsible for ensuring that implementation of the mitigation measures

be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice. The level of detail contained in the response, however, may correspond to the level of detail provided in the comment (i.e., responses to general comments may be general). A general response may be appropriate when a comment does not contain or specifically refer to readily available information, or does not explain the relevance of evidence submitted with the comment."

occurs in accordance with the [monitoring program]." (Guidelines, § 15097, subd. (a).) Thus, the Port's response, in which it indicated that it was not required to delegate its monitoring or reporting program, accurately reflected the law. In addition, the Port's response correctly identified a major problem with the request for an independent monitor, in that the comment requested that a monitor be appointed to "oversee" the "monitoring reporting process" for "all mitigation measures for *all past and present Port CEQA projects.*" (Italics added.) The 2019 SEIR, however, as noted in the Port's response to this comment, involved consideration of the China Shipping *Terminal* at the Port—it is not a Port-wide environmental document. The Port sufficiently explained that a request to appoint an independent monitor to assess compliance with Port-wide projects was beyond the scope of the 2019 SEIR. Further, there is nothing in CEQA or the Guidelines that required more than what the Port provided in its response to the request for appointment of a third-party monitor. Again, the Guidelines require an agency to provide reasoned analysis only in response to "significant environmental issues" raised in comments whenever the agency's position is "at variance" with the comment about the "significant" environmental issue. (Guidelines, § 15088, subd. (c).) A request for a particular compliance program—or, more particularly, for the appointment of a monitor for a particular compliance program—does not itself raise a concern about a "significant environmental issue," but instead is a comment on the *process* of addressing the significant environmental issues addressed in the environmental document. The Port's response was sufficient with respect to this matter.

Although appellants have framed their argument as one taking issue with the Port "not respond[ing] adequately to Community Petitioners' request" for an independent compliance monitor, we note that certain aspects

41

of the argument appear to suggest that appellants' true problem with the Port's response is, in fact, that the Port rejected the suggestion of an independent compliance monitor and instead chose to monitor compliance itself.[20] To the extent that appellants' challenge is not to the adequacy of the Port's response to the comment, but is instead an assertion that the Port should have appointed an independent monitor to ensure compliance with the mitigation measures, such a challenge must be evaluated differently by a court reviewing an agency's action. The adequacy of a mitigation monitoring or reporting program "is evaluated according to the ' "rule of reason," ' which is deemed satisfied if the program is ' "reasonably feasible." ' " (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 773, quoting *Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 446; see *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 380.) Here, there is nothing intrinsically infeasible about the Port retaining authority over any monitoring and/or reporting program for purposes of ensuring compliance with the adopted mitigation measures. In fact, while the Guidelines permit an agency to delegate reporting or monitoring responsibilities to a third-party, the presumption is that the agency will be responsible for any reporting or monitoring program. Although the Port's history with respect to mitigation of the significant environmental effects caused by the operation of the Terminal has left appellants concerned—with good reason—about the Port's commitment to ensuring mitigation compliance in the future, the Port's decision not to delegate compliance monitoring to an independent party and to instead

---

[20] For example, Community Petitioners contend that "[t]he history here demonstrates a serious risk that mitigation will, once more, languish unenforced" in the absence of a third-party monitor.

retain jurisdiction over compliance monitoring is an option contemplated by CEQA and the Guidelines and is not itself unreasonable.

> iv. *The Port's decision to delete as infeasible the drayage truck fleet mitigation measure requiring an increasing percentage of trucks to utilize LNG and the Port's failure to adopt an alternative mitigation for the reducing emissions from the use of drayage trucks*

The 2008 EIR included mitigation measure MM AQ-20, which provided for a phased-in requirement that the Terminal gradually limit access to diesel-fueled drayage trucks while gradually increase access to LNG-fueled drayage trucks instead.[21] Specifically, the mitigation measure required that (a) in 2012 and 2013, 50 percent of drayage trucks granted access to the Terminal would be LNG fueled; (b) in 2014 through 2017, 70 percent of drayage trucks granted access would be LNG fueled; and (c) by 2018, 100 percent of the drayage truck fleet servicing the Terminal would be LNG fueled. MM AQ-20 required China Shipping to make gate modifications to ensure that the required percentages of LNG-fueled drayage trucks were accessing the Terminal, and placed "responsib[ility] for the trucks" on the Port. As with all of the mitigation measures in the 2008 EIR, however, MM AQ-20 was never made enforceable; as a result, MM AQ-20 was only ever partially implemented.[22]

---

[21] "Drayage" is the term used to describe that portion of the movement of containerized goods into and out of ports by way of public streets and highways.

[22] China Shipping never made any gate modifications at the Terminal, and the Terminal never reached the percentages for LNG fueled drayage trucks required by MM AQ-20. For example, in 2014, only 6 percent of the drayage trucks entering the Terminal were LNG fueled.

In the 2019 SEIR, the Port concluded that MM AQ-20 was infeasible and eliminated it. The Port further concluded that there was "no feasible substitute or replacement measure for requiring a terminal-specific drayage truck fleet."

On appeal, SCAQMD makes two arguments in connection with the Port's treatment of mitigation with respect to the use of drayage trucks at the Terminal. SCAQMD contends that the Port's determination that MM AQ-20 is infeasible is not supported by substantial evidence. SCAQMD further asserts that the Port's determination that it could not adopt an alternative mitigation measure requiring the use of other zero- or near-zero-emission truck technology for the drayage fleet servicing the Terminal was an abuse of the Port's discretion because the Port "employed an unlawfully narrow interpretation of the statutory term 'feasible,' and failed to support its feasibility determination with substantial evidence."

### A. *Deletion of MM AQ-20*

SCAQMD contends that the Port's decision to delete MM AQ-20 is not supported by substantial evidence in the record. SCAQMD cites to the fact that MM AQ-20 places responsibility for the LNG-fueled trucks on the Port, as opposed to China Shipping, to argue that the Port's reasons for eliminating the mitigation measure are not supported by the record. SCAQMD also generally attacks the Port's reasoning and the evidence to support its decision to eliminate MM AQ-20.

After an EIR has been adopted, a mitigation measure may be modified or eliminated if it has been "found to be impractical or unworkable." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1509 (*Lincoln Place*).) "[A] previously adopted mitigation measure cannot be deleted 'without a showing that it is infeasible.'" (*Ibid.*, quoting *Napa*

44

*Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 359 (*Napa Citizens*).) "[B]ecause an initial determination" regarding the feasibility of a mitigation measure "must be included in the EIR and supported by substantial evidence[,] it is logical to require a later determination a mitigation measure is infeasible be included in a supplemental EIR and supported by substantial evidence." (*Lincoln Place*, at p. 1509, fns. omitted.)

In April 2017, Ramboll Environ prepared for the Port a "Final Report" titled "Assessment of the Feasibility of Requiring Alternative-Technology Drayage Trucks at Individual Container Terminals" (the Ramboll Report) This report, which was prepared "with the help of Dr. John Husing, an economist specializing in the economy of Southern California," analyzed the drayage activities at the Ports of Los Angeles and Long Beach, and sought to "assess[ ] the feasibility of requiring individual marine container terminals to ensure that only certain types of drayage trucks, namely those fueled by non-diesel fuels, haul containers in and out of the terminals."

The Ramboll Report noted that in order to implement an alternative-fuel-only requirement on the drayage operations at single terminal at the Port, the terminal would have to either "[c]ontract with one or more trucking firms to dedicate LNG/zero-emissions trucks to that terminal (notwithstanding that terminals are not involved in the drayage of container business)," "[f]orm its own drayage operation to offer such service to shipping lines and beneficial cargo owners," or "[t]urn away all non-LNG or non-zero-emissions trucks at the terminal gates." The Ramboll Report ultimately concluded that "the structure of the goods movement industry and the economics of LNG/zero-emission equipment versus diesel equipment renders each of these approaches infeasible." Specifically, the Ramboll Report

determined that a terminal-specific mitigation measure requiring LNG-fuel or other zero-emissions drayage trucks was infeasible due to "incompatib[ility] with the structure of the drayage industry," technical limitations with LNG truck capabilities, and commercial impracticality due to the competitive disadvantage such a measure would cause to a single terminal in the face of other terminals not having such a requirement. The 2019 SEIR relied on the Ramboll Report's analysis and conclusions in making a finding that MM AQ-20 is infeasible. The analysis and opinions provided in the Ramboll Report are precisely the type of evidence on which an agency may rely in making necessary findings under CEQA. (See Guidelines, § 15384, subd. (b) ["Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."].)

SCAQMD seems to suggest that MM AQ-20 required that the Port somehow subsidize or "bear[ ] full responsibility for funding [LNG] trucks," and that, as such, the measure should not have been eliminated because the Ramboll Report "did not assess [the] economic feasibility" of the Port paying for new LNG-fueled drayage trucks to be used at the Terminal or "even of the Terminal bearing ultimate financial responsibility with the Port maintaining economic support for such trucks through subsidies or other incentives." However, the mitigation measure at issue here was a terminal-specific mitigation measure, and the Ramboll Report concluded that no individual terminal could meet the 100 percent LNG-fueled truck requirement without *industry-wide* changes. Because the Ramboll Report's analysis demonstrated that terminal-specific drayage truck mandates are infeasible for operational, technological and economic reasons, the Ramboll Report supports the Port's conclusion that retaining a *terminal-specific LNG drayage truck mitigation*

*measure*, regardless of who is required to implement the measure, is infeasible.

> B.   *Failure to adopt an alternative mitigation measure for reducing drayage truck fleet emissions at the Terminal*

SCAQMD also complains that the Port's failure to replace the eliminated MM AQ-20 with an alternative to mitigate the emissions from drayage activities at the Terminal violates CEQA.  According to SCAQMD, although it has become clear that LNG-fueled drayage truck technology has not advanced as anticipated when the 2008 EIR was prepared, new zero- or near-zero-emission truck technology has become increasingly commercialized and has been the subject of more demonstration projects at the Port.  SCAQMD contends that in concluding that "there was 'no feasible substitute or replacement measure' for mitigation of *any* air emissions from drayage trucks," the Port "employed an unlawfully narrow interpretation of the statutory term 'feasible,' and failed to support its feasibility determination with substantial evidence."  We disagree.

As an initial matter SCAQMD's argument with respect to the lack of a replacement mitigation measure for drayage fleet emissions fails to acknowledge that the 2019 SEIR was considering whether it was feasible to impose a mitigation measure regarding drayage trucks that would be applicable only to drayage trucks *utilized at the Terminal*.  The Ramboll Report analyzed the feasibility of imposing a terminal-specific mitigation measure requiring the use of various possible alternative zero- and/or near-zero-emission technology and concluded that such a measure would be infeasible.  Again, the analysis demonstrated that any ability to mitigate emissions from the drayage truck fleet used at the Port would require a Port-wide (and, possibly, industry-wide) solution—not a single terminal attempt at

47

limiting the types of drayage trucks that may be used at that terminal. The Ramboll Report explained that any attempt to impose such mitigation in connection with a single terminal would be infeasible.

SCAQMD nevertheless contends that the Port "expressly declined to even evaluate any technology that was not already in widespread commercial deployment," and therefore "effectively defined feasible as 'capable of being accomplished successfully immediately,' rather than 'capable of being accomplished within a reasonable period of time.'" As previously discussed, CEQA defines the term "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364.) No further explanation of what is meant by "within a reasonable period of time" is provided in CEQA or the Guidelines. SCAQMD argues that in order to give the phrase "reasonable period of time" meaning, "feasible must be forward-looking and the lead agency must allow time for full implementation of the mitigation." SCAQMD further contends that a "reasonable period of time" must include consideration of the length of time over which a project is undertaken, and that since the project at issue here involves a 40-year operational lease, the implementation time for any mitigation need only be "successfully accomplished over some duration of the project's operation time." We do not disagree with SCAQMD's suggestion that the phrase "within a reasonable period of time" should be considered in the context of the timeline for a project overall, but we do not view the Port's decisionmaking with respect to declining to impose an alternative drayage truck mitigation measure to MM AQ-20 as constituting the failure to consider the context or timing of this project, as a whole.

48

The 2019 SEIR specifically responded to comments regarding concerns about drayage truck emissions, and in so doing noted that multiple demonstration projects involving "the development and testing of zero- and near-zero-emissions drayage trucks" had been undertaken and/or were continuing at the time the 2019 SEIR was adopted. For example, one such project, referred to as the "Zero Emissions Cargo Transport Project (ZECT II)," was a "follow-up" to a prior similar project, and involved the development and assembly of "six fuel-cell/battery-electric hybrids and one natural gas/battery-electric hybrid" for testing "for drayage service." However, "[a]s of late 2018, none of the units had entered revenue service in their planned demonstration tests pending completion of development and resolution of a number of design and fabrication issues," and "[o]ne model entered an in-service demonstration deployment in 2018 that revealed a number of operational and technical flaws." The 2019 SEIR also referred to a different pilot project, called the "Large-Scale Zero Emission Truck Deployment Pilot Project," pursuant to which the Ports of Los Angeles and Long Beach were "preparing a scope of work for demonstrating a large-scale (50-100 units) deployment of zero-emission drayage trucks in field operation" and were "currently [as of 2019] assembling trucking and truck manufacturing partners." The 2019 SEIR identified no less than seven additional projects or programs being undertaken to develop and test zero- or near-zero emission drayage technology.

After reviewing these projects and programs, the 2019 SEIR referred to a recent evaluation of the status of zero- and near-zero-emission drayage truck technology completed in 2019 by Tetra Tech/GNA pursuant to a requirement of the 2017 CAAP (the Tetra Tech Study or Study). The Tetra Tech Study evaluated the commercial availability, technical viability,

49

operational feasibility, and availability of fuel and infrastructure to support alternative technologies, as well as the economic workability of alternative technologies. The Study determined that, as of late-2018, a zero-emission battery-electric and several near-zero-emission natural gas fueled Class 8 truck models were commercially available from original equipment manufacturers. Other alternatives, such as zero-emission fuel cell, near-zero-emission hybrid electric, and near-zero-emission diesel, had no commercial availability and "did not appear to be likely to be available by 2021." As to the limited battery-electric and natural gas fueled truck options that are commercially available, however, the Study found that the battery-electric technology "is promising but still faces challenges and constraints," such as their weight, which limits the weight of cargo that can be hauled, the time needed for charging, their short range capabilities, as well as the fact that there was only a single original equipment manufacturer "supporting these trucks," and "very limited charging infrastructure in place."

The 2019 SEIR notes that the "current generation of natural-gas-powered near-zero-emission trucks . . . do not appear to pose serious operational feasibility challenges to widespread deployment," however, the "major challenge . . . identified was the need for natural gas fueling infrastructure to *expand regionally fast enough to support large-scale deployment*." (Italics added.) This concern highlights the importance of industry-wide changes to the successful implementation of alternative fuel drayage technology. Because, however, the "Clean Trucks Program strategy outlined in the 2017 CAAP[, which is a Port-wide strategy to phase out high emission trucks serving Port terminals,] recognizes that near-zero-emission technology for drayage trucks has matured to the point of commercial feasibility," starting in 2020, "only *near-zero*-emission trucks will receive a fee

50

exemption for entering Port terminals, and starting in 2023, all new entries to the Port Drayage Truck Registry must meet or exceed the near-zero-emission standard." (Italics added.) The Port noted that the "effect of this policy" at the Terminal as well as all other terminals at the Port "will be to increase the proportion of near-zero- and zero-emission trucks that pass through the terminals' gates over time." However, the 2017 CAAP also determined that "most near-zero and zero-emission technologies may take several years to become commercialized and feasible for drayage," while the 2019 Tetra Tech Study "concluded that considerably more progress needs to be made in order to bring zero-emissions technology into widespread use in drayage industry." As a result, it was "too early to mandate specific requirements for zero-emission technology in the drayage fleet, but it is appropriate to modify the truck rate such that by 2035 only zero-emission trucks will receive fee exemptions" on a Port-wide basis.

The Port's consideration of alternatives to diesel fueled drayage trucks in the 2019 SEIR thus did not effectively apply an "immediacy" requirement for determining whether a drayage truck emissions mitigation measure for the Terminal would be feasible, but instead considered the current status of the drayage trucking industry as a whole with respect to alternatives to diesel, as well and the time frame over which the necessary significant changes to that industry might be able to occur given a variety of technological, operational, and economic considerations, and particularly in light of the fact that any mitigation in the 2019 SEIR would necessarily be Terminal-specific. This is what CEQA requires (see § 21061.1 [feasible means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors"]), and we see no abuse of the Port's

51

discretion with respect to its decision that the imposition of a Terminal-specific mitigation measure regarding drayage truck emissions would not be capable of being accomplished successfully within a reasonable period of time. The Port is envisioning a multi-year time horizon for both near-zero and zero emissions technologies, and the 2019 SEIR appears to weigh a complex set of technological and economic factors, as well as an acknowledgement that any mitigation imposed solely at one terminal while not being similarly imposed with respect to other terminals, would place that terminal at an economic disadvantage, as described in the Ramboll Report. Further, the above evidence is sufficient to support the Port's determination that there was no feasible alternative to MM AQ-20 for mitigating drayage truck emissions in connection with operation of the Terminal. It is particularly important to remember that in reviewing the sufficiency of an EIR, our "task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or *could be better mitigated*. [A reviewing court has] neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393, quoting *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283.) Here, the 2019 SEIR properly informed decisionmakers about the air quality consequences of operating the Terminal with respect to the drayage activities at the Terminal and explained the reasons why a terminal-specific mitigation measure with respect to those activities was not feasible over a multi-year period, in compliance with CEQA's requirements. (See *Federation*

*of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th
1180, 1198 ["[A] public agency is not required to favor environmental
protection over other considerations, but it must disclose and carefully
consider the environmental consequences of its actions, mitigate adverse
environmental effects if feasible, explain the reasons for its actions, and
afford the public and other affected agencies an opportunity to participate
meaningfully in the environmental review process."].)

> v. *The Port's decision to modify a 2008 EIR vessel speed reduction program mitigation measure*

SCAQMD challenges the Port's decision to eliminate a mitigation
measure in the 2008 EIR—MM AQ-10—that had required 100 percent
compliance with the Port's Vessel Speed Reduction Program (VSRP), and to
instead impose a mitigation measure requiring only 95 percent compliance
with the VSRP.

MM AQ-10 as set out in the 2008 EIR required that by 2009, 100
percent of all vessels calling at the Terminal would be required to comply
with the Port's VSRP.  As introduced in 2001, the VSRP was a voluntary
program created pursuant to a multi-party Memorandum of Understanding
to encourage vessels calling at the Port to reduce their speeds within a
certain radius of the Port to help reduce the pollutant emissions from those
vessels.[23]  Beginning in 2005, the Port offered financial incentives to
encourage shipping lines to reduce their vessel speeds to 12 knots within 20
nautical miles (nm) of Point Fermin at the Port.  In 2009, the Port expanded

---

[23]   As explained in the 2017 CAAP, "[w]hen ships slow down, the load on
the main engines decreases considerably as compared to operation at higher
speeds."  As a result, "[o]peration at slower speed typically decreases the total
energy required to move the ship through water," and "[t]his energy
reduction translates to less fuel burned and fewer emissions."

the program to provide additional incentives to encourage ships to reduce speeds to 12 knots within 40 nm of the Port. The 2017 CAAP noted that the voluntary VSRP had been "extremely successful," in that the ships reduced their speed in compliance with the program at a rate of 95 percent within the 20 nm zone, and 90 percent within the 40 nm zone. The 2017 CAAP notes that both the Port of Los Angeles and the Port of San Pedro "continue to require vessel speed reduction within in 40 nm, where possible, through new or renewed leases, which provide another mechanism for ensuring compliance."

As adopted in the 2008 EIR, MM AQ-10 required that *all* vessels calling at the Terminal, without exception, would have to reduce their speeds to 12 knots within the 40 nm zone. In the 2019 SEIR, however, the Port determined that 100 percent compliance with the VSRP for ships calling at the Terminal was not feasible, and the Port therefore eliminated the 100 percent compliance requirement, instead replacing it with a 95 percent compliance rate requirement and asserting that this level of compliance represents the "maximum feasible mitigation measures for . . . vessel speed reduction."

SCAQMD contends that the Port's decision to weaken the 100 percent compliance rate for the VSRP in the 2008 version of MM AQ-10 and its decision to instead require only a 95 percent compliance rate are decisions that are not supported by substantial evidence. We find merit in SCAQMD's contentions.

Again, a previously adopted mitigation measure is presumed to be feasible, given " 'the presumption that the governing body adopted the mitigation measure in the first place only after due investigation and consideration.' " (*Lincoln Place*, *supra*, 130 Cal.App.4th at p. 1509; *Napa*

*Citizens*, *supra*, 91 Cal.App.4th at p. 359.)  Therefore when an agency seeks to eliminate or modify the measure, the agency must provide a "legitimate reason" for the departure, and there must be substantial evidence to support its determination.  (*Lincoln Place*, at p. 1509.)  In support of its decision to delete the 100 percent VSRP compliance rate in MM AQ-10 and to adopt a 95 percent compliance rate instead, the Port refers to the RDSEIR as evidence that the 100 percent compliance rate is operationally infeasible.  However, the RDSEIR merely asserts, without reference to specific evidence, that "not all vessels will be able to comply with VSRP requirements" because of the "unavoidable practical need to increase speed for various reasons."  The RDSEIR states that noncompliance is "typically the result of pressure on vessel schedules caused by weather, port delays, and mechanical problems."  However, there is no data provided or citations to other types of evidence to support these assertions.  For example, there is no citation to a report completed by experts, no reference to interviews with shipping line managers, and no reference to an actual incident in which weather, port delays, or mechanical problems were relied on by a shipping line to explain why a particular vessel could not feasibly comply with the voluntary VSRP while coming into the Port.  Instead, the sole basis for the Port's assertion that sometimes vessel noncompliance with the VSRP is "unavoidable" appears to be a claim asserted by China Shipping; in other words, the only other location in the RDSEIR that includes a reference to the asserted operational infeasibility of a 100 percent VSRP compliance rate is in a section outlining the "technical, operational, and practical problems" of measures included in the 2008 EIR about which China Shipping had complained to the Port.  The RDSEIR states that "China Shipping informed LAHD, and LAHD confirmed, that it may not be feasible to achieve 100% VSRP for the 40-mile

radius, under the terms of MM AQ-10." However, the document provides no explanation as to *how* the Port "confirmed" the lack of potential feasibility, nor is there any reference to actual data or evidence to support the claims made by China Shipping regarding the claimed operational infeasibility of full compliance with the VSRP. In other words, there is no reference to actual evidence to support the assertion that 100 percent compliance is infeasible; mere assertions, without substantiation, are insufficient to constitute substantial evidence under CEQA. (See Guidelines, § 15384, subds. (a), (b) [substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts," but does not include "[a]rgument, speculation, *unsubstantiated opinion or narrative*," or "clearly erroneous or inaccurate evidence" (italics added)].)[24] Moreover, the language used by the Port regarding the assertion indicates only that it "*may not be* feasible to achieve" the 100% compliance—not that it *is* infeasible to achieve full compliance as contemplated by the 2008 EIR.

The Port also contends that historical Port-wide data indicates that 100 percent compliance with the VSRP is infeasible, and argues that this data provides substantial evidence to support the Port's conclusion that a 95 percent compliance rate constitutes the only feasible mitigation related to vessel speeds at the Port. For example, the Port asserts that 100% compliance with the VSRP has never occurred. The record does include data from the 2017 CAAP demonstrating that Port-wide "[p]articipation within the 20 nm zone is approximately 95%, and just under 90% within the 40 nm

[24] We do not intend to suggest that the infeasibility of 100 percent compliance with the VSRP could not be demonstrated. We are merely explaining that this record does not include substantial evidence to support such a conclusion.

[zone]."[25]  Indeed, the 2017 CAAP includes a "goal" of voluntary compliance at a rate of 95 percent for all vessels calling at the Port, and the Port suggests that this "goal" is substantial evidence of "what is feasible."  However, what this fails to acknowledge is that the 2017 CAAP and the Port-wide data is based on a *voluntary* vessel speed reduction program; the Port historically has not *required* compliance with the VSRP.  Indeed, only recently has there been any attempt to implement compulsory vessel speed reduction through requirements placed into leases with other terminals at the Port pursuant to EIRs adopted for those terminal projects; the 2017 CAAP indicates that the Port will "continue to require vessel speed reduction within 40 nm, where possible, through new or renewed leases, which provide another mechanism for ensuring compliance."[26]

In briefing, the Port suggests that its finding that the 100% compliance rate as adopted in the 2008 EIR is infeasible is "supported by the 2017 CAAP."  In other words, the Port relies on the 2017 CAAP to claim that 100 percent compliance with the VSRP is infeasible.  However, the citation to the 2017 CAAP offered by the Port merely discusses the success of the voluntary VSRP program and states that the Port will continue to try to ensure further compliance with the VSRP within the 40 nautical mile radius through new and renewed leases.  In other words, the 2017 CAAP appears to envision a

[25]    The 2017 CAAP does not provide the time period during which the voluntary VSRP compliance Port-wide was calculated to be 95 percent within 20 nm and just under 90 percent within 40 nm.

[26]    The 2019 SEIR indicates that a *compulsory* VSRP compliance rate of 100 percent has been adopted and made enforceable in connection with the Port's lease with at least one other terminal operator, although the Port contends that because such a measure "is a recent development[,] it is too early to conclude that it represents a feasible measure."

goal of *more* compliance with the VSRP than has been obtained through the voluntary program by way of additional *requirements*, imposed through terminal leases, which in turn are guided by requirements for mitigation in terminal project EIRs.  This is further supported by a statement in a 2017 report created by the Port providing updates regarding its voluntary VSRP.  In that document, the Port states that it "continues to push for 100% participation in the VSR program" and is using its financial incentives to encourage such participation.

Further, the Port itself recognized that the design of the financial incentives intended to encourage voluntary compliance with the VSRP likely failed to encourage as much voluntary participation in the program as was possible.  Specifically, the Port noted in the RDSEIR that "[o]ne element of the revised [VSRP] that is being considered is to convert the incentive payment from being based on the fleet-wide average compliance rate to a per-vessel-call basis."  Such a change "could encourage participation on an individual call basis for shipping lines that would not otherwise participate in the 40 nm program today because they are unable to meet the [annual] minimum to qualify" for the incentive.  In other words, because of the structure of the incentive being provided on a per *shipping line* basis, rather than on an *individual vessel* basis, some vessels that might have otherwise sought a financial incentive through voluntary compliance with the VSPR may have decided not to comply with the voluntary program because their shipping line was no longer in contention to receive a financial incentive for that year.

Thus, even when one considers the historical data, the *voluntary* VSRP compliance rates do not necessarily provide information as to what rates of compliance might be obtained through *compulsory* speed reduction.  At a

58

minimum, there is no analysis referred to or provided by the Port to suggest that the rates of compliance in a voluntary program provide the ceiling for compliance rates of a compulsory requirement. Further, even the data regarding the voluntary program indicates that 95 percent compliance does *not* represent all feasible vessel speed emission mitigation. The record shows that in 2014, for example, the China Shipping Terminal obtained a 99 percent compliance rate within the 20 nm zone, and a 96 percent compliance rate within the 40 nm zone, under the voluntary VSRP. In 2015, the Terminal's compliance rates were 99 percent within the 20 nm zone, and 98 percent within the 40 nm zone, and in 2016, the Terminal saw 100 percent compliance within 20 nm, and 96% within 40 nm. Although the voluntary VSRP compliance numbers dropped in 2017 to 96 percent within 20 nm and 91 percent within 40 nm, in 2018 they again rose to 99 percent within 20 nm and 95 percent within 40 nm. As the Port acknowledged in response to SCAQMD's comments to the RDSEIR, "the high compliance rates in the VSRP data cited by the comment show [that] shipping lines calling at the [China Shipping] Terminal have approached 98% compliance at the 40 nm limit." Thus, the compliance rates obtained at the Terminal through the Port's *voluntary* VSRP indicate that the Port's selected 95 percent compliance rate does not represent the extent of feasible mitigation, since the Terminal has seen greater than 95 percent voluntary compliance on an annual basis for multiple years. At a minimum, however, even if the Terminal's average annual compliance under the *voluntary* program was no more than 95 percent, there is no analysis to support the idea that this number represents the maximum compliance rate achievable through a compulsory program.

The Port also cites to the 2017 CAAP to suggest that certain vessels may not want to comply with the VSRP because "a 12-knot vessel speed may

not be the optimal speed from an emissions perspective," and that this is support for the modification of MM AQ-10 from 100 percent compliance to 95 percent compliance. Although the idea that there may be vessels for which the 12-knot speed is not optimal for emission reductions could, in theory, support a decision to require less than 100 percent compliance with the 12-knot vessel speed requirement of the VSRP, the record does not provide any indication as to how many shipping lines utilize such vessels, let alone how many of these vessels call at the Terminal. As a result, there is no evidentiary link between the existence of vessels for which the ideal vessel speed for emissions is something faster than 12 knots and the Port's decision to reduce the required VSRP compliance rate at the Terminal from 100 percent to 95 percent.

It also appears from the 2019 SEIR that the Port seems to have concluded that the environmental effects of a reduction from 100 percent compliance to 95 percent compliance were "negligible," and that this purportedly "negligible" effect also supported the Port's conclusion that 95 percent compliance was the maximum feasible mitigation possible through vessel speed reduction at the Terminal. The RDSEIR and the 2019 SEIR both state, "The 95% requirement at 40 nm is consistent with recent [Port] EIRs and with how shipping lines at terminals have been performing at [the Port]. It incorporates the realities of oceangoing cargo vessel operation and the need to maintain economic competitiveness. Furthermore, *the actual effect on air quality and public health of requiring 95% rather than 100% would be negligible* given the relatively small contribution of at-sea vessel emissions on health risk and the already-high level of compliance with the 12-knot requirement." (Italics added.) The RDSEIR (but not the 2019 SEIR) cites to "Table 2-4" in support of the claim that there was an "already-high

60

level of compliance with the 12-knot requirement,"[27] but neither document cites to, identifies, or refers to any evidence supporting the Port's assertion that the "actual effect on air quality and public health . . . would be negligible."[28] On appeal, the Port contends that SCAQMD "misstates" the record by contending in its opening brief that "a reduction of 5% compliance is *alone* enough to exceed the CEQA significance threshold for NOx in most years," and cites to a page from an October 8, 2019 memorandum sent from Chris Cannon to the LAHC regarding the Port's "Response to NRDC's Letter on Final Supplemental Environmental Impact Report for [the Terminal] Project." Setting aside the question whether this document provides evidence in the record to support the Port's decisions in the 2019 SEIR, given that this document was created *after* the Port issued the 2019 SEIR and is dated the same date as the Board certified the 2019 SEIR and given that it does not appear to be incorporated into or cited by the 2019 SEIR, the relevant statement on that page of the record provides:

> "The Port stands by its statement that a 5% increase [*sic*] in VSRP compliance in a zone 20 to 40 nautical miles from shore (the zone in which the bulk of non-compliance currently takes place) would have a negligible impact on public health, given the inevitable dispersion and dilution of air pollutant over such a distance. The table below shows the difference in annual berthing emissions (tons per

---

27    As included in the RDSEIR, Table 2-4 is a table demonstrating the VSRP compliance rates for all of the terminals at the Port in 2014; the table shows that in 2014, the China Shipping Terminal obtained compliance rates of 99 percent within the 20 nm zone and 96 percent within the 40 nm zone.

28    In response to SCAQMD's comments about the modification of MM AQ-10, the Port asserts in the 2019 SEIR that the RDSEIR "points out that the effects on public health and air quality of a non-compliance rate of 5% are negligible." Nothing in this response includes evidence to support the claim, however.

61

year) between the Revised Project (requiring 95% AMP compliance) and the FEIR Mitigated Scenario (requiring 100% AMP compliance), and also the difference between annual emissions in the VSRP zone (tons per year) between the Revised Project (requiring 95% VSRP compliance) and FEIR Mitigated Scenario (requiring 100% VSRP compliance). As shown in the table, the difference in emissions reductions that would result if it were feasible to implement mitigation requiring 100% compliance with AMP and VSRP is, in many instances, barely discernable, and is in no instance substantial."

The "table" referred to provides estimates of various pollutant emissions under the 95 percent VSRP compliance rate in the modified MM AQ-10 and compares them with the estimates of various pollutant emissions under the 100 percent VSRP compliance rate as required by the 2008 EIR. The referenced table, however, suggests that the Port's assertions are unsupported. Specifically, with respect to NOx, one of two pollutants that create the secondary pollutant ozone, the 2019 SEIR used a CEQA significance threshold of 55 pounds per day, which is equivalent to approximately 10 tons per year. Under the 95 percent VSRP compliance measure, NOx emissions were estimated to be *more than* 10 tons greater per year than they would be under the 2008 EIR's 100 percent VSRP compliance measure for multiple years for which estimates were provided. Thus, the Port's own data demonstrates that at least as to one major pollutant, the reduction from a 100 percent compliance rate to a 95 percent compliance rate would be significant—not negligible. Further, while the Port asserts that the "*dilution of air pollutants over*" the 40 nm zone means that there would be a "negligible impact on public health," yet again, there is no citation to evidence in the record to support this assertion. As already noted, substantial evidence includes "facts, reasonable assumptions predicated upon facts, and

62

expert opinion supported by facts." (Guidelines, § 15384, subd. (b).) A claim made without citation to an authoritative source offers nothing more than an unsubstantiated assertion by the Port about purportedly "negligible" negative health effects. This is insufficient to support a conclusion that the reduction in the required mitigation will have "negligible" health effects, and thus is insufficient to support any further conclusion by the Port that its decision to modify a previously adopted 100 percent VSRP compliance rate mitigation measure down to 95 percent compliance represents the full extent of feasible mitigation in connection with the speed of vessels calling at the Terminal.

We thus conclude that there is no clear rationale in the record demonstrating the how and why of the Port's decision to modify MM AQ-10 by reducing the required speed limit compliance from 100 percent to 95 percent. The Port relies on no study, expert opinion, or other substantiation to support the 95 percent number. The data on which the Port relies involves a voluntary program, and such data does not support the conclusion that a 95 percent compliance rate is the maximum vessel speed mitigation that is feasible; in fact, the data suggests that greater compliance has been obtained even in the absence of a *compulsory* vessel speed reduction program. Given the lack of substantial evidence to support its decision with respect to the VSPR, we conclude that the Port abused its discretion in modifying MM AQ-10—by reducing it from 100 percent compliance down to 95 percent compliance with the VSRP—in the 2019 SEIR.

2. *Appellants' challenge to the trial court's decision with respect to the remedy to impose for the CEQA violations identified*

Appellants contend that the trial court erred in connection with its chosen approach to remedying the various CEQA violations it determined the Port committed in connection with the certification of the 2019 SEIR.

63

Specifically, they argue that while the court made findings that the Port had "committed a 'profound' violation of CEQA by failing to make any [of the 2019 SEIR's] mitigation measures enforceable," the court nevertheless "perplexingly concluded that it could 'only' direct the Port to set aside the SEIR—and nothing more." As appellants argue, the court's selected remedy, which does not abate operations at the Terminal or place a strict timeline on the Port's rectification of the CEQA violations in the 2019 SEIR, effectively "allows the Port to continue its illegal operation of the [T]erminal without enforceable mitigation measures" in place, and thereby fails to "redress the violation that court found" had occurred.

According to appellants, the trial court legally erred in concluding that it lacked the authority to order the Port to correct its violations of CEQA under section 21168.9, CEQA's remedy provision, and the court also abused its discretion in failing to weigh the equities of allowing the Terminal to continue to operate without any mitigation taking place.

a.     *Additional relevant background*

In addition to making findings regarding specific mitigation measures that the Port either modified from the 2008 EIR or adopted for the first time, the trial court specifically found that *all* of the mitigation measures on which the Port was relying in the 2019 SEIR were in violation of CEQA's requirements because the Port failed to ensure that any of the mitigation measures were enforceable. The trial court in no uncertain terms expressed frustration with the Port's failures—over a multi-year period—to ensure that actual mitigation takes place with respect to the significant environmental effects of operations at the Terminal. The trial court found, for example:

> "The critical assumption underlying the SEIR's environmental analysis—i.e., that China Shipping would agree to amend its lease in 2019 to require mitigation—is

64

completely baseless. . . . [¶] . . . The Port has countenanced years of China Shipping's breach of existing lease provisions and obdurate refusals to negotiate new permit conditions, all without taking any action against China Shipping in the form of contract remedies or termination. And the record is replete with examples supporting the conclusion that China Shipping has, time after time, stubbornly refused to agree to implement mitigation measures. [¶] Given this history, the court readily concludes the mitigation measures are not legally enforceable, and thus do not pass muster under CEQA. The record establishes it is not feasible to achieve mitigation through negotiations with China Shipping, because the only substantial evidence before the court is that China Shipping is an unwilling participant in negotiations. Thus, the Port's position is exposed for what it is: a mere expression of hope, untethered to any realistic expectation that China Shipping will sublimate its desire for profitable port operations to the requirements of California law and the well-being of port workers and nearby residents."

The trial court noted that the Port did not include any binding instrument connected to project approvals that would allow it to enforce the proposed mitigation measures in the 2019 SEIR. The result is that the entire environmental document "was destined to be struck down by the courts." The court rejected the Port's suggestion that "this case presents 'unusual circumstances' " because NRDC did not sue China Shipping, and responded that "the only 'unusual circumstances' present here are the Port's repeated failures over many years to adopt a negotiating position with China Shipping which places compliance with California environmental law and the health of harbor workers and residents ahead of (or at least on equal footing with) its desire to appease its largest tenant."

Despite these findings, the trial court concluded that the "only" remedy it could impose to address the extensive CEQA violations committed by the

65

Port in connection with the 2019 SEIR was an order directing the Port to set aside the 2019 SEIR.[29] The court stated, "The court may not direct the Port to carry out its obligations under CEQA in any particular way. Pub. Res. Code § 21168.9(c). Absent a consent decree, the court may only declare an earlier CEQA document invalid and order it set aside. The court has done so here." The trial court ordered the City to set aside the August 2020 certification of the 2019 SEIR, along with "other related project approvals," made a writ returnable in 60 days, and declared that the court "retains jurisdiction under Pub. Res. Code section 21168.9(b)."

  b.  *Standards of review applicable to challenges to a trial court's determination of a remedy in a CEQA writ proceeding*

While one set of standards applies to questions involving appellate review of *an agency's* actions, a different set of standards apply to appellate challenges to *a trial court's* determination of the appropriate remedy to impose to address an agency's CEQA violation(s).

The parties disagree as to the standard of review applicable to appellants' contention that the trial court erred with respect to the remedy it fashioned to address the Port's CEQA violations. The Port contends that a "trial court's decision regarding the scope of the writ" is to be reviewed "under an abuse of discretion standard," and cites *Golden Gate Land Holdings LLC v. East Bay Regional Park Dist.* (2013) 215 Cal.App.4th 353, 368, and *San Bernardino Valley Audubon Soc. v. Metropolitan Water Dist. of Southern California* (2001) 89 Cal.App.4th 1097, 1107, in support of its position. Under this standard, the Port argues, in order to succeed on appeal,

---

[29] The court also rejected requests made by CARB and NRDC to provide additional briefing on the question of an appropriate remedy.

appellants must demonstrate that "the trial court's remedy abuses the discretion afforded to it under CEQA."

In contrast, appellants argue that an appellate court reviews de novo a "trial court's legal interpretation of its remedy powers under section 21168.9."

The parties are both correct—at least partially. A challenge to a trial court's chosen writ remedy in a CEQA matter may implicate two questions. First, a challenge may question whether the court properly interpreted the authority granted under section 21168.9, as appellants' first contention regarding the trial court's remedy decision does here. An appellate court reviews a trial court's interpretation of section 21168.9 de novo. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 287 (*Preserve Wild Santee*).) However, a challenge to a trial court's chosen writ remedy may also implicate the question whether the trial court abused its discretion in *applying* section 21168.9 to the facts of a specific case by choosing a particular remedy. Appellants in this case also set out a challenge to the trial court's chosen remedy, thereby implicating this second type of question. Where an appellant's challenge is to the manner in which the trial court has chosen to exercise its remedial authority, an appellate court reviews the trial court's decision regarding the appropriate remedy for an abuse of discretion. (*Ibid.*, citing *Ho v. Hsieh* (2010) 181 Cal.App.4th 337, 344–345.)

c.     *Application*

Appellants' first argument is that the trial court simply miscomprehended its authority under section 21168.9 to fashion an appropriate remedy for the Port's CEQA violations. This contention requires us to consider the meaning of that provision and determine whether the trial court properly interpreted it, which are questions we consider de novo. (See *Preserve Wild Santee*, *supra*, 210 Cal.App.4th at p. 287.)

67

In assessing the meaning of a statutory provision, " '[w]e consider first the words of a statute, as the most reliable indicator of legislative intent.' [Citation.] In doing so, we give the words 'their usual and ordinary meaning,' viewed in the context of the statute as a whole. [Citation.] As part of this process, ' " '[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " ' [Citation.]" (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184.)

Section 21168.9 provides a court with various avenues for addressing violations of CEQA, providing in full:

> "(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following:

> "(1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part.

> "(2) If the court finds that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project, a mandate that the public agency and any real parties in interest suspend any or all specific project activity or activities, pursuant to the determination, finding, or decision, that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with this division.

> "(3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(b) Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division. The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division. The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division.

"(c) Nothing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way. Except as expressly provided in this section, nothing in this section is intended to limit the equitable powers of the court."  (§ 21168.9.)

The Guidelines explain the trial court's remedial options more plainly:

"(a) Courts may fashion equitable remedies in CEQA litigation.  If a court determines that a public agency has not complied with CEQA, and that noncompliance was a prejudicial abuse of discretion, the court shall issue a peremptory writ of mandate requiring the agency to do one or more of the following:

"(1) void the project approval, in whole or in part;

"(2) suspend any project activities that preclude consideration and implementation of mitigation measures and alternatives necessary to comply with CEQA; or

"(3) take specific action necessary to bring the agency's consideration of the project into compliance with CEQA." (Guidelines, § 15234, subd. (a).)

In this case, the trial court correctly noted that the Port's decision to exclude from the Revised Project's approvals any binding instrument, such as an amendment to the Lease, that would permit the Port to enforce the mitigation included in the 2019 SEIR effectively undermined the validity of the entire 2019 SEIR. The court also correctly noted that mitigation " 'cannot be deferred past the start of the project activity that causes the adverse environmental impact,' " and highlighted that in this situation, the Port "has gone forward with . . . the continued operation of the Terminal—without implementing the mitigation measures [on which it relied in the 2019 SEIR] to combat emissions," which "constitutes a profound violation of CEQA."

In response to this "profound" CEQA violation, however, the trial court ordered only that the Port set aside the 2019 SEIR and begin anew to certify a CEQA-compliant environmental document. The trial court's statements regarding the scope of its authority to fashion a remedy demonstrate that the trial court incorrectly believed that its authority extended only so far as what is identified in subdivision (a)(1) of section 21168.9. The court specifically stated that "[a]bsent a consent decree, the court may only declare an earlier CEQA document invalid and order it set aside." Nevertheless, the trial court's remedy—ordering the Port to set aside the 2019 SEIR while still allowing the Port to continue to operate the Terminal pursuant to the Lease without any of the purportedly-adopted mitigation being enforced while the

70

Port prepares a new SEIR—permits the Port to violate CEQA without any real consequence. CEQA does not countenance such a result. Rather, a trial court may use one or a combination of three options for *ensuring* CEQA compliance and the protection of the physical environment from adverse changes or alterations due to project activities after a violation has been found: a trial court can void the agency's action (§ 21168.9, subd. (a)(1)), suspend project activities (*id.*, subd. (a)(2)), and/or direct the agency to undertake specific actions to bring its decision-making into compliance (*id.*, subd. (a)(3)). Thus, while it is true that under subdivision (a)(1) of section 21168.9, the court may decide that an order mandating that an agency void its determination with respect to an environmental document is appropriate, there is nothing in section 21168.9 that provides that this is the *only* remedy available to the trial court. (See, *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 761 (*POET*); see also *San Bernardino Valley Audubon Soc. v. Metropolitan Water Dist. of Southern California* (2001) 89 Cal.App.4th 1097, 1102 (*San Bernardino Valley*) [section 21168.9 "provides alternative remedies which allow the trial court to tailor the remedy to fit the violation"].)

Beyond this, subdivision (c) of section 21168.9 also makes clear that a trial court retains all of its traditional equitable powers to remedy violations of the law: "Except as expressly provided in this section, nothing in this section is intended to limit the equitable powers of the court." The trial court seemingly believed that its equitable powers were limited, however, by the other sentence in subdivision (c) of section 21168.9, which provides clarification that a court may not "direct any public agency to exercise its discretion in any particular way." This limitation does not bind a trial court in the way that the court believed. While an agency has discretion to

71

determine *how* to comply with CEQA and cannot be told how to do so in the first instance, an agency does not have discretion to decide *whether* to comply with CEQA; thus, an order directing an agency to comply with CEQA, including by ordering it to "take specific action as may be necessary to bring [its] determination, finding, or decision into compliance with [CEQA]" (§ 21168.9, subd. (a)(3)), is entirely within the court's remedial authority. Indeed, ordering the Port to make enforceable the mitigation measures the Port has already determined are feasible measures does not require the Port to exercise its discretion in any particular manner. Rather, it simply directs the Port to comply with CEQA's mandates.

Further, section 21168.9 permits a court to consider whether the activities of the project that is the subject of an EIR or a negative declaration should continue while an agency takes actions necessary to comply with CEQA. "Under the current version of section 21168.9, subdivision (a), the trial court may allow a portion of the work to proceed while the agency is complying with CEQA. Under subdivision (a)(1), the trial court may void the action of the public agency in whole or in part. . . . Under subdivision (a)(2), the trial court may suspend specific project activity that may damage the environment until the agency has taken actions that are necessary to comply with CEQA." (*San Bernardino Valley, supra,* 89 Cal.App.4th at p. 1105; see *POET, supra,* 218 Cal.App.4th at p. 760.) "Suspension of project activity is one of the three "mandates" available under subdivision (a) of section 21168.9[,] and subpart (2) of that provision addresses when suspension is appropriate. First, suspension requires a finding 'that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project . . . .' [Citation.] Second, the suspension appears to be limited to project activity 'that could

72

result in an adverse change or alteration to the physical environment . . . .' [Citation.]" (*POET*, *supra*, at p. 761.)

Thus, it seems apparent from this record that the trial court misapprehended the scope of its authority under section 21168.9, as the trial court did not consider subdivisions (a)(2) and (a)(3) in deciding the appropriate remedy to impose. Certainly, a "remedy" that permits Terminal operations to continue in the absence of the implementation and enforcement of *any* of the feasible mitigation measures identified by the Port—particularly those adopted in the 2008 EIR and readopted in the 2019 SEIR—for some unknown period of time while the Port undertakes action to create a CEQA-compliant environmental document that corrects the failures of the 2019 SEIR is no real remedy at all, and seems to be at odds with one of the primary purposes of CEQA—i.e., the "[p]revent[ion of] significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when . . . feasible." (Regulations, § 15002, subd. (a)(3); see *Laurel Heights*, *supra*, 47 Cal.3d at p. 424 ["A primary purpose of CEQA is to protect the environment."].)[30] CEQA gives a trial court authority to fashion a remedy in the face of CEQA violations that supports, rather than undermines, CEQA's environmental protection purpose. Given the trial court's too-narrow understanding of its remedy

---

[30] We note, as well, that the Supreme Court has applied former section 21168.9, which was substantially similar to the current version, to permit a court to impose a timeline for an agency to undertake the actions ordered as part of necessary CEQA compliance. (See *Laurel Heights*, *supra*, 47 Cal.3d at p. 428 [directing the court of appeal to order the trial court "to retain jurisdiction over this action and to specify promptly, after notice and hearing, a date by which the [agency] must certify a new EIR in accordance with CEQA standards and procedures, including provisions for public comment, and to make any findings that may be required by CEQA"].)

powers under section 21168.9, the matter must be remanded to permit the trial court to exercise its authority in a manner consistent with the full authority granted it pursuant to CEQA's remedial statute.[31]

We are remanding for the trial court to exercise its discretion to fashion an appropriate remedy in the first instance, and note that the trial court has available to it a range of remedial options under the Guidelines. For example, the court may decide that the Port's prior conduct related to the Terminal warrants the setting of a strict timeline for the Port's adoption of a new SEIR and the enforcement of the Lease to ensure compliance with mitigation measures. In addition, the court may order that shipping activities at the Terminal be suspended in the interim, unless specific mitigation measures duly adopted in the 2019 SEIR (or, where relevant, the 2008 EIR measures reinstated by the court) are implemented. (See *Preserve Wild Santee, supra,* 210 Cal.App.4th at pp. 288–289 [Section 21168.9 "expressly allows a court to mandate the suspension of any project activities that might adversely affect the environment and prejudice the consideration or implementation of mitigation measures or project alternatives until the public agency complies with CEQA."].) China Shipping is obligated by the Lease's terms to comply with the mitigation measures set forth in any duly-adopted environmental document, as the Lease requires China Shipping to "at all times, in its use and occupancy of the premises and in the conduct of its operations thereon, comply with all laws, statutes, ordinances, rules and

---

[31] Given our conclusion regarding the trial court's error in failing to appreciate the breadth of the authority granted under section 21168.9 to determine the most appropriate remedy to actually address the CEQA violations identified in this case, we need not consider appellants' alternative argument that the trial court abused its discretion in failing to weigh the equities of allowing the Terminal to continue to operate without any mitigation taking place.

regulations applicable thereto, enacted and adopted by federal, state, regional, municipal or other governmental bodies, or departments or offices thereof." (Italics added.) As these options demonstrate, the trial court possesses "flexibility in fashioning remedies to ensure compliance with [CEQA]" (*Farmland Protection Alliance v. County of Yolo* (2021) 71 Cal.App.5th 300, 312), and it should exercise its discretion in a way that furthers CEQA's purpose while ensuring that the Port complies with CEQA's mandates.

In sum, we conclude that four of appellants' challenges to the 2019 SEIR are without merit. Specifically, substantial evidence supports the Port's decision to delete as infeasible the drayage truck fleet mitigation measure requiring drayage trucks calling at the Terminal to utilize LNG, as well as the Port's decision not to adopt an alternative mitigation measure for reducing emissions for drayage trucks calling at the Terminal. Substantial evidence also supports the Port's decision not to adopt a zero-emission demonstration project for cargo-moving equipment such as top handlers and large forklifts. Finally, the Port acted within its legal authority in deciding not to appoint an independent monitor to track mitigation compliance, and it sufficiently responded to the comment requesting appointment of an independent monitor.

However, as to two other specific challenges to elements of the 2019 SEIR, we conclude that the record is insufficient to support the Port's decisions. First, we agree with appellants that the Port's decision to modify the VSRP mitigation measure from 100 percent compliance to 95 percent compliance is not supported by substantial evidence. Further, we conclude that the Port has failed to adequately explain the basis for and support with

75

evidence its decision to make a GHG emissions fund measure a lease measure rather than a mitigation measure.

Finally, we conclude that the trial court erred with respect to its interpretation and application of section 21168.9, and thus mistakenly limited its options for fashioning a remedy that reinforces CEQA's environmental protection purposes.

## IV.

## DISPOSITION

The judgment is reversed, and the case is remanded for the trial court to exercise its discretion to remedy the CEQA violations identified by the trial court, as well as those additional violations identified in this opinion, in light of the full scope of the remedial authority granted to it by section 21168.9.

The parties are to bear their own costs on appeal.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

KELETY, J.

76

Filed 1/19/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES et al., <br><br> Defendants and Respondents; <br><br><br> CHINA SHIPPING (NORTH AMERICA) HOLDING CO., LTD. et al. <br><br> Real Parties in Interest and Respondents. | D080902 <br><br><br><br> (Super. Ct. No. 37-2021-00023385-CU-TT-CTL) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed December 29, 2023, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); the request(s) pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

cc:  All Parties

2